Nott, J.,
delivered the opinion of the court:
The military trial which is now brought before the' court by this civil action attracted great attention at the time, both from the high rank and prominent official position of the accused and the unusual if not novel character of the proceedings by which the final result, the sentence of the court-martial, was reached. We have considered the present case with deliberation commensurate with its great importance to the claimant and to the administration of military justice, and now announce the conclusions of this court.
When a person enters the military service, whether as officer or private, he surrenders his personal rights and submits himself to a code of laws and obligations wholly inconsistent with the principles which measure our constitutional rights. He also submits himself to the administration of justice by military tribunals whose power extends to fines and forfeitures, to the deprivation of rank and pay, to imprisonment, and even to punishment by death.
The proceedings of these military tribunals can not be reviewed in the civil courts. No writ of error will lie to bring up the rulings of a court-martial. Even in the trial of a capital offense the various steps by which the end is reached can not be made the subject of judicial review. The only tribunal that can pass upon alleged errors and mistakes is the commanding officer, charged with that responsibility, who, in cases like the present, must be the commander-in-chief, that is to say, the President. When the record of a court-martial comes into a civil court in a collateral way, the only questions which can be considered may be reduced to these three: First, was the court-martial legally constituted ; second, did it have jurisdiction of the case; third, was the sentence duly approved and authorized by law.
Undoubtedly errors are committed by courts-martial which a civil tribunal would regard as sufficient ground for a reversal for their judgments, if it were sitting as an, appellate court. But there is always this radical difference between an appellate *218 court sitting for the correction of errors and a civil court into which the record of a court-martial is collateral — in the former there is not a failure of justice; the appellate court may reverse a judgment or prescribe another or award a new trial; in the latter, the court must either give full effect to the sentence or pronounce it wholly void.
Among the objections which are now taken to the proceedings of the court-martial are the following:
That officers inferior in rank to the claimant were appointed on the court when this could have been avoided.
That officers of known hostility to the claimant were selected and appointed as members of the court.
That a person was permitted to act as judge-advocate who was not appciinted or sworn as such.
That the court flagrantly violated the laws of evidence on the trial in a manner detrimental to the claimant.
That while the court-martial was in the midst of another trial in which the claimant was the accused, and while the evidence against him only was before the court, the court was required to reconsider this case, and under such prejudice to inflict another sentence.
If this court were sitting as an appellate tribunal in review of the proceedings of the court-martial these objections might be good assignments of error; but it is the opinion of the court that such errors can not be reviewed collaterally, and that these do not affect the constitution of the court-martial, or its jurisdiction of the case before it, or the legality of the sentence which it pronounced.
There are, however, other objections raised which are more difficult in determination, and the first of those goes to the constitution of the court.
It is contended that “ there was no law authorizing the appointment of the court-martial;” that is to say, “ the appointment of a general court-martial” by the President “in time of peace for the trial of a general officer.” The order convening the court runs in these words:
“War Department, . Washington, June 30, 1884.
“ By direction of the President a general court-martial is appointed to meet in this city at 11 o’clock a. m. on Wednesday, the 10th day of September, 1884, or as soon thereafter as practicable, for the trial of such persons as may be brought before it.” ■ ' ' '
*219 Then follows tbé detail of the members of the court, and the order is signed by the Secretary of War.
Before this the President had ordered a court of inquiry to investigate the matters alleged against the claimant and after the coming in of the report the Secretary of War had ordered the recorder of the court of inquiry to prepare charges and specifications against the accused. Later the claimant was placed under arrest “by direction of the President” and ordered to report in person before the court-martial for trial. Upon this record the claimant contends that the charges were, in effect, preferred by the President; that the court was appointed and its members selected by the President; that the sentence was approved by the President, and that a court-martial thus instituted was unauthorized by law and its sentence wholly void.
But the question immediately to be considered does not extend to all of these official acts, and is indeed no broader than this, whether the President has authority to order a court-martial in any other case than the single instance prescribed by the seventy-second article of war. This article at that time was in these words:
“Any general officer commanding the Army of the United States, a separate army, or a separate department, shall be competent to appoint a general court-martial either in time of peace or in time of war. But when any such commander is the accuser or prosecutor of any officer under his command the court shall be appointed by the President, and its proceedings and sentence shall be sent directly to the Secretary of War, by whom they shall be laid before the President for his approval or orders in the case.” (Bev. Stat., § 1342, Art. 72.)
The contention of the claimant is that the President has no inherent power to appoint courts-martial; that the commander-in-chief of the Continental forces (which is a case cited by writers who maintain the contrary) did not assume to appoint such courts until expressly authorized by the Continental Congress ; that the power exercised by the Crown at the time of the adoption of the Constitution, which, it has been supposed, was recognized by the framers of the Constitution when they expressly declared that the President shall be commander-in-chief of the land and naval forces, was not a power inherent or constitutional, an attribute of executive sovereignty, but was in fact derived from the Mutiny Acts and other statutes; *220 and that an. American court-inartial is tbe creature of statute law, and all other methods of appointing general courts-martial are in effect excluded by the enactment of the methods provided by the seventy-second article of war. This position is fortified by much historical research and an elaborate and able argument.
Whether the power to order or appoint courts-martial is an inherent attribute of the President as commander in chief is, in the present condition of our laws, an abstract question which no court is at liberty to decide. An inherent attribute •of an office established by the Constitution must exist without statutory authority, and can not be taken away by statutory authority. If Congress by some legislative inadvertence should abolish all laws relating to courts-martial, without enacting others, there would then be a question whether the President could convene them as a necessary incident of his power of command and of his authority to maintain military discipline, on which the power to command rests. But no such condition of things now exists. Military offenses and their punishments are defined or regulated by statute, and jurisdiction concerning them is conferred upon these military tribunals. The practical and immediate question before the court is whether in the present condition of the law the President had authority to convene this general court-martial to try this officer upon the charges actually preferred against him.
As has been said, the position of the claimant is that the President had power to appoint a court-martial only in the single instance named in the seventy-second article, as it then stood; and the Lieutenant-General (under whose immediate ' command the claimant was) not being his “ accuser or prosecutor,” a case had not arisen in which the President could so act. An elementary writer has also gone so far as to say:
“Congress has the exclusive power of constituting military courts; it can declare how these courts are to be organized, their jurisdiction, by whom, aud in what manner they are to be ordered, of whom they shall consist, their forms of proceeding; in fine, Congress has full and absolute power in all things pertaining to military tribunals, and the President can in no way interfere with matters relating to these tribunals except so far as he is expressly authorized.” (O’Brien on American Military Law.)
*221 It may be historically true that the commander in chief during-the Revolution ascribed his power to order courts-martial directly to the Continental Congress; and it may also be true that at the time of the adoption of the Constitution the annual consent of Parliament to the existence of a standing army was conditioned upon statutory provisions relating to such military tribunals, though upon these historical questions the court expresses no opinion; but nevertheless there remains the significant fact in our military system that the President is always the commander in chief. Congress may increase the Army, or reduce the Army, or abolish it altogether; but so long as we have a military force Congress can not take away from the President the supreme command. It is true that the Constitution has conferred upon Congress the exclusive power “to make rules for the government and regulation of the land and naval forces;” but the two powers are distinct; neither can trench upon the other; the President can not, under the disguise of military orders, evade the legislative regulations by which he in common with the Army must be governed; and Congress can not in the disguise of “rules for the government” of the Army impair the authority of the President as commander in chief.
It seems evident, then, to the court that as courts-martial are expressly authorized by law, and the authority to convene them is expressly granted to military officers, this power is necessarily vested in the President by statute, though it may not be inherent in his office. A military officer can not be invested with greater authority by Congress than the commander in chief and a power of command devolved by statute on an officer of the Army or Navy is necessarily shared by the President. The power to command depends upon discipline, and discipline depends upon the power to punish; and the power to punish can only be exercised in time of peace through the medium of a military tribunal. If the President has no authority in matters pertaining to military tribunals unless it be “expressly” granted by Congress, then Congress, by the simple expedient of exclusively granting the authority to appoint courts-martial and approve sentences to a few officers of the Army and tacitly ignoring the President, could practically defeat the express declaration of the Constitution and strip *222 the office of commander in chief of all real powers of command. .
The court cannot ascribe any such purpose to the legislation of Congress. Indeed, it seems evident to the court that if the seventy-second article was enacted with the intent that the President should exercise no authority except in the single instance where it is withheld from the commanding officers and exclusively devolved on him, it would be necessary to ' ascribe an absurd purpose to this legislative enactment, viz: That the intent of the statute was that the General of the Army and the Lieutenant-General should be exempt from punishment. If, for illustration, in 1884 the Lieutenant-General had stood in the place of the Judge-Advocate-General, how could he have been court-martialed? He certainly could not have appointed his own court-martial and ordered himself before it. A general commanding a militay department could not have done so, because the Lieutenant-General was not in his department or under his command. The President could nothave appointed the court because the seventy-second article only requires, or, if it be preferred, authorizes him to do so in those cases where a “general officer commanding the Army of the United States, a separate army, or a separate department,” is “ the accuser or prosecutor of any officer under his command.” The Lieutenant-General, therefore, would have been exempt from punishment so long as punishment depended upon a trial by court-martial.
It also appears by the first Articles of .War enacted after the adoption of the Constitution, those of 1806 (Act 10th April, 1806, 2 Stat L., p. 359, art. 65), that while general officers commanding an army or colonels commanding a department were authorized to appoint courts-martial, no provision whatever was made for courts to try these commanding officers. Itis incredible that Congress intended that such officers should be exempt from trial by court-martial; and as the same statute (sec. 3) declared void the preconstitutional articles of war which placed this power exclusively in “the general officer commanding the troops,” it seems to 'the court manifest that Congress supposed that the Constitution supplied the need of an express statutory authority to the commander in chief. Since the earliest legislation of our Government it has undoubtedly been understood and intended that whatever powers were granted *223 to general officers in regard to courts-martial were at the same time granted and intended to be shared by the President.
The legislative history of courts-martial renders the legislative intent still clearer.
At the time of the adoption of the Constitution, the Articles of War In force were those of May 31, 1786. They provided that “ general courts-martial shall be ordered as often as the case may require by the general officer commanding the troops.”
“An act to recognize and to adapt to the Constitution of the United States the establishment of the troops raised under the resolves of the United States in Congress assembled, and for other purposes therein mentioned,” is the first statute establishing rules for the government of the Army after the adoqition of the Constitution. It provides:
“Sec. 4 And be it further enacted, That the said troops shall be governed by the Eules and Articles of War which have been established by the United States in Congress assembled, or by such rules and articles of war as may hereafter by law be established.” (Aet September 29,1789, 1 Stat. L., p. 95.)
“ An act for regulating the military establishment of the United States,” passed a few months later, is to the same effect:
“Sec. 13. And be it further enacted, That the commissioned officers, noncommissioned officers, privates, and musicians aforesaid shall be governed by the Eules and Articles of War which have been established by the United States in Congress assembled, as far as the same may be applicable to the Constitution of the United Stutes, or by such rules and articles as may hereafter by law be established.” (Aet May 26, 1790,1 Stat. L., p. 113.)
“ An act for establishing rules and articles for the government of the armies of the United States,” contains the first Articles of War framed after the adoption of the Constitution, and the article authorizing courts-martial is in these words;
“Article 65.' Any general officer commanding an army, or colonel commanding a separate department, may appoint general courts-martial whenever necessary.” (Aet April 10,1806, 2 Stat. L., p. 359.)
Not until 1830 did the President come into a statute relating to courts-martial, and the enactment is plainly restrictive of the preceding legislation — it is to limit the authority of commanding officers — not to confer power upon the President:
“ An act to alter and amend the sixty-fifth article,” &c.: Be *224 it enacted, That whenever a general officer commanding an army, or a colonel commanding a separate department, shall be the accuser or prosecutor of any officer in the Army of the United States under his command, the general court-martial for the trial of such officer shall be appointed by the President of the United States.” (Act May 29, 1830, 4 Stat. L., p. 417, sec. 10
The foregoing statutes were gathered together by the Bevised Statutes, but with some changes in substances, andformed the article before quoted under which the President acted in this case. Finally, the act of July, 1884, carried the article back to its original purpose and left it as follows:
" Art. 72. Any general officer commanding an army, a territorial division, or a department, or colonel commanding a separate department, may appoint general courts-martial whenever necessary. But when any such commander is the accuser or prosecutor of any officer under his command the court shall be appointed bythePresident; and its proceedings and sentence shall be sent directly to the Secretary of War, by whom they shall be laid before the President for his approval or orders in the case.” {Act July 5,1884, 23 Stat. L., p. 121.)
It is said that courts-martial are the creatures of statute law. But so also are regiments. There can be no standing army without statutory authority. Congress may place the com-, mand of a regiment in a colonel, a lieutenant-colonel, a major, or any other officer; but when Congress so enact they, without words to that effect, likewise place the command in the Commander-in-Chief. His name is to be understood as written in every statute which confers upon a military officer military authority.
We come now to a more difficult part of the case — the question whether the sentence of this court-martial was authorized by law.
The charge against the claimant was “ conduct unbecoming an officer and a gentleman;” and the charge rested on the averment that the claimant had defrauded or attempted or intended to defraud a firm of private bankers in Washington, doing business in the name of Bateman & Co. The specifications are long, containing much detail and matter that under ordinary rules of pleading in civil suits would be deemed argumentative and inferential; but the question of guilty or not guilty comes back to the fraud or attempted fraud upon Bate-man & Co. If no fraud was committed, or attempted or in *225 tended to be committed, there was no ground primarily for the charge. The matter was brought before the Secretary of War by a letter from one of the firm, in which he says: “ It becomes my duty to prefer charges against Brig. Geni D. G. Swaim, at the head of the Bureau of Military Justice of the United States Army, for fraudf etc. “ I stand ready to prove that the said D. G. Swaim has committed a fraud, etc. “I am further ready to prove the said D. G. Swaim assisted to negotiate with this firm army pay vouchers which he knew to be fraudulent,” etc.
As to'this last charge, assisting to negotiate army pay vouchers which he knew to be fraudulent, it is now virtually out of the case, for upon it the claimant was found not guilty.
When these charges of Bateman were laid before the Secretary of War he referred the communication to- the claimant for explanation. The last charge certainly was a serious one, and being connected with a public scandal highly prejudicial to the honor of the Army, merited the closest scrutiny of the Secretary of War. The answer of the claimant to it was one which might have been satisfactory to one person and not to another. It briefly narrates the claimant’s part in the transactions of the delinquent officer; it disavows in substance any part in the fraud, but it concedes that the officer came to the claimant to procure an advance of “several months’pay on his account,” and that he, the claimant, gave him a letter of introduction to Bateman & Go., “in a friendly way.” It does not give the name of ati officer who was a witness of the claimant’s part in the transaction, nor call for the production of the letter which he gave, nor set forth an explicit denial of the charge, nor demand an investigation, if his explanation should not be satisfactory to the Secretary of War. Moreover, the charges of, Bateman, dated the 16th April, 1884, were published by him in the newspapers of that same day, and the claimant, instead of bringing, an action of libel against him or otherwise resenting the infamous charges which had been both made and published, immediately sought him, and effected a settlement on the day after their publication, and Bateman at the same time, April 17, sent a second communication to the Secretary of War, in which he said:
*226 “1411 F Street, Bateman & Co., Bankers,
“Washington, I). G., April 17,1884.
“To tie Hon. Secretary oe War:
“Dear Sir: Tlie suit against our firm, on the duebill mentioned in my charges of yesterday against General D. G-. Swaim, having been withdrawn and the differences between General Swaim and myself satisfactorily settled, I hereby withdraw the charges contained in my letter of April 16th against said General D. G. Swaim, he claiming they were made under a misapprehension of facts, which I concede.
“Very truly, yours,
“A. E. Bateman.”
The Secretary of War is fully justified, in the opinion of the court, in bringing the matter to the personal attention of the President, if only because of the peculiar position of the accused as Judge-Advocate-General of the Army; and the President was fully justified in ordering it to be investigated by a court of inquiry, and upon the report of that court in ordering charges to be preferred, and the claimant to be tried by court-martial. It was possible that Bateman & Co., and the claimant by mutual explanations could clear up a business misunderstand: ing and in good faith arrived at a conclusion not discreditable to either; but it was not possible that a settlement of their business differences could efface from the records of the War Department the averment that Bateman “was ready to prove” that the Judge-Advocate-General had assisted in negotiating vouchers “which he knew to be fraudulent.”
Nevertheless, with this last charge taken out of the case by the acquittal of the accused, it must be remembered that the serious offense of conduct unbecoming an officer and a gentleman depended upon the question of a fraud perpetrated or attempted upon Bateman & Co. by the claimant., The specifications do indeed aver that his reply to the Secretary of War was “ evasive, uncandid, and false, and calculated and intended to deceive the Secretary of War.” But the falsity of the reply depended upon the fraud charged in the first specification. If there was a fraud practiced upon Bateman & Co., then the reply was false; if there was no fraud practiced, there was little or nothing to be false about.
It is manifest that the court-martial intended to find and found that no fraud had been practiced or attempted, and when that conclusion was reached the charge of conduct unbecoming *227 an officer and a gentleman fell, and upon it tbe court properly-found tbe accused not guilty. But as in criminal law a jury may convict tbe prisoner of a lesser offense of tbe same nature than that charged in tbe indictment, as of manslaughter where tbe indictment is for murder, so in military law a court-martial may find the accused guilty of a lesser offense than tbe principal charge, if it be covered by and be within tbe scope of tbe specifications. Accordingly in this case tbecourt found tbe accused guilty of many acts allegedinthe specifications and formulated them under tbe “Charge, conduct to tbe prejudice of good order and military discipline, in violation of tbe sixty-second article of war.”
It is always embarrassing to a civil court when it must leave its own field of statutes and judicial authorities, and found a judgment upon tbe unwritten codes of military ethics and military administration. In tbe recent case of Fletcher (26 C. Cls. R., 541, 562), where tbe court was obliged to pass upon tbe legality of a sentence for conduct unbecoming an officer and a gentleman, resting upon a series of acts which neither civil nor criminal jurisprudence would have stigmatized as fraudulent, .it was said:
“It is bard for tbe trained lawyer to conceive of an indictment or declaration which should allege that tbe defendant defrauded A or B by refusing toreturn to him tbe money which be bad borrowed from him. Our legal training, tbe legal habit of mind, as it is termed, inclines us to dissociate punishment from acts which tbe law does not define as offenses. As one of our greatest writers of fiction puts it, with metaphysical fitness and accurate sarcasm, as she describes one of her legal characters, “ His moral horizon was limited by the civil code of Tennessee.” We learnt as law students in Blackstone that there are things which are malum in se and, in addition to them, things which are merely malum ¡prohibitum; but unhappily in the affairs of real life we find that there are many things which are malum in se without likewise being malum ¡prohibitum. In military life there is a higher code termed honor, which" holds its societyto stricter accountability; and it is not desirable that the standard of the Army shall come down to the requirements of a criminal code.”
So in the present case, the court is obliged to pass upon acts which transgress no statute or rule of the common law, an d yet which may constitute the military offense of conduct to the prejudice of good order and military discipline. The Articles of *228 War do not define either of these offenses, nor can a court of law. What is conduct unbecoming an officer and a gentleman, or what is conduct to the prejudice of good order and military .discipline is beyond the bounds of exact formula, and must depend more or less upon the circumstances and peculiarities of each case. To slap a woman in the face is no more violation of the law than to slap a man in the face. Tet under the code of military ethics, to slap a woman in the face might be regarded as a cowardly act and be classified as conduct unbecoming an officer and a gentleman. To commit an assault on any person is an offense at law; but under the other code, not to commit an assault, as where a ruffian was insulting an unprotected girl, might be deemed conduct unbecoming an officer and a gentleman. The cases which involve conduct to the prejudice of good order and military discipline are still further beyond the bounds of ordinary judicial judgment, for they are not measurable by our in ate sense of right and wrong, of honor and dishonor, but must be gauged by an actual knowledge and experience of military life, its usages and duties. All that a civil court can do in these collateral cases is to look into the record and see that the wide discretion which the Articles of War' give to a court-martial and the commanding officer who approves the sentence hasnotbeenabused;that the sentence does not rest on supposititious or frivolous pretexts; that the case presents facts which a body of experienced, intelligent, impartial, military experts may reasonably hold, in the exercise of a sound discretion, to be prejudicial to good" order and military discipline. When such facts appear, the civil court must concede that they constitute the offense embodied in the charge.
On looking into the record in the present case we find legal references and conclusions which do not seem to be warranted by the facts found, and matters of which the claimant was adjudged guilty that certainly can not affect directlyorin-directly the good order or military discipline of the Army. The court-martial refused to find that the claimant attempted to commit “ a fraud” upon Bateman & Co., and substituted for “fraud” the word “wrong;” but the findings show that he had deposited money with Bateman & Co. as bankers and received a statement of his accounts setting forth that he had been credited with “the said deposit;” and that they at the same time had given to him an instrument which has been *229 variously called by Bateman a “duebill,” by tbe claimant “a negotiable promissory note,” and by tbe court-martial an “acknowledgment as a memorandum of tbe deposit,” wbicb was in these words:
“ Due D. G-. Swaim, or order, $5,000 for value received. -
Bateman & Co.
“Washington, D. C., July 15th, 1882.
“Ten per cent and interest 6 per cent.”
Tbe findings further show that tbe claimant “in tbe course of business transactions with that firm reduced tbe balance to bis credit” until tbere “ was due him only a balance of $33.89” when be transferred and assigned tbe instrument “to tbe firm of Bright, Humphrey & Co., builders, etc., of Washington,” “and did thereupon knowingly seek through tbe said last-named firm to obtain from and compel a payment by tbe said firm of Bateman &Oo., on their said acknowledgement,” “thus attempting to commit wrong upon tbe said Bateman & Co.” Tbe findings do not show that this instrument was commercial paper by mercantile usage in tbe District of Columbia, nor that it passed to Bright, Humphrey & Co. as negotiable paper, in good faith, before it bad become due, and for a present consideration; nor do they show that tbe claimant was insolvent and unable to respond to Bateman & Co. in whatever damages they might recover for their alleged advances to him. Therefore, according to tbe findings, Bright, Humphrey & Co. acquired no greater right or equity than the claimant himself possessed, and whatever defense could be set up against him could be set up as against them.
Inasmuch, then, as there was a balance remaining due to the claimant, and (as the court-found) the purpose of the assignment was “to obtain from and compel a payment by Bateman & Co. on their said acknowledment;” and inasmuch as the claimant had an unquestionable legal right to compel such a payment, and Bright, Humphrey & Co. could compel nothing more, this court is unable to preceive that a “wrong” could have been done by the assignment. If the claimant had sold the instrument to Bright, Humphrey & Co. upon assurances that the whole amount named in it remain unpaid, a wrong would have been done that firm. But no such charge was preferred against the claimant, nor do the findings of the court show that Bright, Humphrey & Co. ever complained. *230 These remarks are not intended as criticism of the court-martial. A military court does not find in an involved ease like this a general verdict like that of a jury on an indictment, nor a special verdict of the material facts established by the evidence such as is sometimes found in civil cases. It labors under the great inconvenience of having to travel through every specification, line by line and word by word, and find whether the facts alleged did or did not occur. In the present ease the court found the accused “not guilty” as to a single word. Moréover, the findings of a court-martial take the form of“guilty” or “not guilty” and may adjudge iu form that the accused is guilty of an act which was in itself innocent.
But while the court has carefully discarded all matters in the findings which can not, in its opinion, constitute an offense, it still appears that the claimant had prolonged and involved business transactions with these bankers not altogether consistent with the duties of his most responsible military position ; that these transactions were so conducted as to require a lawsuit to bring them to an end, and to subject him to public charges of fraudulent practices; that while under these charges he withdrew the suit against the party who made them, apparently in consideration of his withdrawing his charges against the claimant; that when the letters charging the fraud and withdrawing the charge were referred to him for explanation he neglected to clear np the matter, and on the contrary gave an explanation which was uncandid and evasive, compelling the Secretary of War to take further steps toward removing the shadow which had fallen upon the reputation of the Army, and involving the Government -in the expenses and inconveniences of a court of inquiry and a court-martial; that when an officer of whom he knew little or nothing came to him to raise money on his pay accounts for months in advance, he introduced him to his own bankers apparently without words of caution and directly aided and countenanced a practice which must seriously interfere with an officer’s freedom of action and military efficiency. This court can not say that these acts were not prejudicial to good order and military discipline, and accordingly must hold that they are sufficient to uphold the charge.
We now come to the most complex and difficult question of the case, a question concerning which the court has entertained *231 serious doubts that prolonged deliberation lias not wholly removed.
The question of fraud being out of the case, and the court-martial having properly acquitted the claimant on the charge-of conduct unbecoming an officer and a gentleman, imposed this sentence, “To be suspended from rank, duty, and pay for the period of three years.” The record then went to the President and was by him referred to the Attorney-General.
On the 11th February, 1885, the President returned the record to the court-martial “ for reconsideration as to the findings upon the first charge only, and as to the sentence, neither of which are believed to be commensurate with the offenses as found by the court in the first and third specifications under the first' charge.” The President also communicated to the court the opinion of the Attorney-General, “ whose views,” he added, “ upon the matter submitted for reconsideration have my concurrence.”
In this opinion the Attorney-General regards the facts found as being equivalent to those charged in the specifications, and he sternly censures the result reached in the sentence. After reviewing the action of the court, he says:
/‘The objection to the finding of the court in Gen. Swaim’s case is therefore based upon the obvious inconsistency between the findings of fact as contained in the specifications and the graduation of the offense in the substituted charge. The action of the court as a whole seems to involve a serious lowering of that high standard of honor which from the earliest days has been the pride and glory of our military service, and which was expressed on a memorable occasion by the great commander-in-chief of our Bevolutionary armies, when reluctantly compelled to reprimand a brother officer, in these words: ‘Our profession is the chastest of all; even the shadow of a fault tarnishes the luster of our finest achievements.’”
It is manifest that the Attorney-General did not clearly apprehend the position taken by the court-martial; that he did not perceive that the claimant’s evasive and uncandid action, no matter how described, was something less than and different from the positive offense of fraud. He intimates in his opinion that there is no difference between an intent to perpetrate a, “wrong” and an intent to perpetarte a “fraud”; and he fails, to observe that the court-martial had carefully sifted out of' the specifications the element of fraud which was the grava *232 men of tbe charge, “conduct unbecoming an officer and a gentleman.”
Tbe court-martial, notwithstanding tbe strictures of tbe Attorney-General, properly adhered to its determination that tbe facts found did not constitute tbe offense charged, but it imposed a second sentence upon tbe accused, tbe language of which is as follows: “The court, upon mature reconsideration, has not found tbe accused guilty of such a degree of wrongful or deceitful conduct as to justify a finding of guilty of conduct unbecoming an officer and a gentleman, and has therefore respectfully adhered to its finding upon tbe first charge.” And to this was added tbe following sentence:
“To be suspended from rank and duty for one year, with forfeiture of all pay for tbe same period, and at tbe end of that period to be reduced to tbe grade of judge-advocate with tbe rank of major in tbe Judge-Advocate-G-eneral’s department.”
This sentence tbe President likewise disapproved. He says:
It is apparent from tbe terms of tbe amended sentence that it was tbe intention of tbe court to award a punishment of greater severity and more nearly commensurate with tbe offenses of which tbe accused has been found guilty than was tbe penalty adjudged in tbe original proceedings, and if tbe terms of tbe amended sentence were such as could be legally carried out, tbe purpose of tbe court in that regard would have been accomplished. The provision,, however, that tbe accused shall, after a suspension for tbe period of one year ■ from rank and duty in tbe office now held by him be placed in another office of lower rank in tbe department of which tbe office now held by him is a part, is one impossible of enforcement by tbe Executive alone.- That office of lower rank can only be filled in tbe method pointed out by tbe Constitution, namely, nomination by tbe President and confirmation by tbe Senate, and then only in case of an existing vacancy. Tbe amended sentence, in effect, creates an office and fills it, thus at once embodying tbe exercise of legislative and executive functions, and tbe approving power .of tbe Senate.”
In tbe opinion of tbe court-martial tbe change of position imposed by tbe sentence was one of rank-; in tbe opinion of tbe President it was one of office.
Tbe court a third time deliberated and then imposed tbe sentence which was approved by tbe President and carried into execution and which tbe claimant now attacks. It is—
*233 “To be suspended from rank and duty for twelve years and forfeit one-balf Ms monthly pay every month for the same . period.”
The Articles of War designate many offenses, such as murder, treason, larceny, robbery, burglary, arson, desertion, bribery, cowardice, drunkenness on duty, sleeping upon a post, disobedience of orders, disorderly conduct in quarters, irreverent conduct in church, profanity, etc. The legislative authority then gathers up the nonenumerated, indefinable offenses of military life and places them under the titles of conduct unbecoming an officer and a gentleman, and conduct prejudicial to good order and military discipline.
That this is the well-understood purpose and effect'of the article of war last referred to all military writers agree:
“This provision, taken originally from the British military law, was in substance incorporated in our first code of 1775, and has similarly appeared in each subsequent issue of our Articles of War. As will be illustrated in construing its separate terms, its evident purpose was to provide for the trial and punishment of any and all military offenses not expressly made cognizable by courts-martial in the other and more specific articles, and thus to prevent the possibility of a failure of justice in the Army. In practice, the greater number of the charges that are preferred against' soldiers, and a large proportion of those preferred against officers, are based upon this the ‘ general ’ article of the code. Wherever the offense committed is one not certainly, or fully, designated or described, in some other particular article, or where, though so designated, no punishment is assigned for its commission, or where it is doubtful under which of two or more articles the offender should be prosecuted, recourse is had to this comprehensive and serviceable provision as the authority and foundation for the charges and proceedings.” (Winthrop’s Military Law, Vol. i, p. 1035.)
“ Its policy is to provide a general remedy for a wrong which had not elsewhere been provided for.” (Samuel, Military Law, p. 6885 1816.)
“ There is scarcely any impropriety of conduct or irregularity which an officer or soldier may commit that may not be brought under the 70th article of war.” (Kennedy, Military Law, p. 34; 1847.)
“ The seventieth article of war is the most useful of the whole.”' (Napier, Remarks on Military Law, p. 59; 1837.)
“There are many offences which the soldier and officer may commit and many omissions of which they may be guilty which it would be impossible to distinctly lay down in separate arti *234 cles of war * * *. .Hence it is that this article is resorted to under wbicli tbe sins of commission and of omission are tried and punished. The punishments are discretionary.”
(Hough, Precedents in Military Law, p. 270; 1855.)
“This article is intended to be supplementary to alltheothers and to provide a general charge under which every possible kind of offence, not provided for, may be ranged.” (Ooppée, Field Manual of Courts-Martial, p. 88; 1863.) .
Olode (Military a.nd Martial Law), pp. 12,18, and 40 (1874), refers to it as the Devil’s Article. On page 12 he says: “That article which the soldiers called the Devil’s Article,, viz: for punishing indefinitely crimes for which no’ special order had been set down.”
The purpose and reason of our existing statutory provisions are well expressed in the earliest article of war concerning minor offenses :
“All other faults, disorders, and offences not mentioned in these articles shall be punished according to the general customs and laws of war.” (Articles of the Earl of Essex, 1642. Winthrop’s Military Law, Yol. I, p. 1035).
It is, then, well settled that courts-martial have jurisdiction of minor military offenses and irregularities, and that the punishment therefor is lodged in their discretion. But it is also well settled that this discretion, though unrestricted in terms, must be exercised within reasonable limits ; that only minor punishments can be inflicted for minor offenses' (Dynes v. Hoover, 20 How., 65). Indeed, the principles of our existing military law is .not inaptly set forth in the articles of James II:
“All other faults, misdemeanors, and disorders not mentioned in these articles shall be punished according to the laws and customs of war, and discretion of the court-martial; provided, that no punishment amounting to the loss of life or limb be inflicted upon any offender in time of peace, although the same be allotted for the said offence by these articles and the laws and customs of war.” (Winthrop’s Military Law, Yol. i, p. 1035.)
A court-martial, therefore, in a case of these non enumerated, undefined, minor offenses is entrusted with the triple discretion of determining whether the acts proved are prejudicial to good order and military discipline, and of determining the gravity, seriousness, and degree of the offense, and of imposing an appropriate punishment.
It must also be borne in mind that a commanding officer *235 charged with the duty of reviewing the proceedings of the court can not increase the severity of a sentence. He may approve or disapprove or mitigate, but he can not impose a new sentence of a more severe character.
The Attorney-General grounded his advice to the President upon the Army regulation, which provides that:
“When a court-martial appears to have erred in any respect, the reviewing authority may reconvene the court for a consideration of its action, with suggestions for its guidance. The court may thereupon, should it concur in the views submitted, proceed to remedy the errors pointed out, and may modify or completely change its findings. The object of reconvening the court in such a case is to afford it an opportunity to reconsider the record, for the purpose of correcting or modifying any conclusions thereupon, and also to make any amendments of the record necessary to perfect it.” (Army Regulations, 1881, Sec. 923.)
But it is clear to the court that a regulation, as its name imports, is to regulate and guide proceedings under the'law and not to make or override the law. The purpose of this regulation is well illustrated in the proceedings which followed the second sentence — that is, where a court-martial has inadvertently imposed a sentence impossible of execution, to bring the obstacle to the attention of the court so as to enable it to correct its error. The regulation was not intended to confer upon the reviewing officer power to interfere with the proper discretion of a court, or to require it to do that which he could not himself do — increase the severity of a sentence.
The question presented by the case is believed to be a new one, unless it be identical in legal effect with that which was before the Supreme Court in ex parte Seed (100 U. S. R., 13). In that case there was an unequivocal offence involving no discretion on the part of the court, viz, “malfeasance in the discharge of his official duty.” In this case it was necessarily within the discretion of the court-martial to determine whether the acts constituted an offence; and, if so, its gravity, seriousness, and degree. In both cases the punishment was within the discretion of the court; in both cases the reviewing officer disapproved the^leniency of the sentence; and in both cases the court-martial complied with his recommendation and imposed a severer punishment. On the one hand, it may be said of this case that the President did not interfere with the dis *236 cretion of tbe court; that he clid not require it to impose a more severe sentence; that he merely invited it to reconsider its determination of the case, and left it free to reimpose the same sentence or to impose a milder one or a more severe one. On the other hand, it may be said that the disapproval of the sentence which the court in the lawful exercise of its discretion had imposed did not leave it free to reimpose the same sentence; that disapproving it on the express ground that it was too lenient, in effect compelled the court to impose a more severe one; that in military life a superior officer is conceded to be invested with superior wisdom; and that in such cases the reviewing officer should not be allowed to interfere with the judgment of the tribunal in whom discretion is exclusively vested by law.
But while the last principle is a sound one, which civil tribunals should carefully maintain, it is believed by this court that the decision of the court of last resort in ex parte Seed is conclusive upon this branch of the case.
The sentence of the court-martial was approved by the President and carried into execution on the 24th February, 1886. This action was brought ou the 24th February, 1891. That is to say, the claimant waited until half of his sentence had expired and until the last day before the statute of limitations would bar a part of his demand/ during which period he rendered no service whatever, and then brought an action for the forfeited portion of his pay.
In Ide’s Case (26 C. Cls. R., 401), where an officer erroneously dismissed did nothing for an unreasonable length of time, it was held that he had acquiesced in the order dismissing him, and abandoned the office. In Hildeburn’s Case (13 id., 62), where an officer had been mustered out as a supernumerary and had accepted the benefits given to such officers (one year’s pay without service), it was held to be a conclusive admission, and that he could not then contest the legality of his discharge. But the court is of the opinion that there is a distinction between those cases and the present one, inasmuch as all relations between the Government and the officer were there severed, or intended to be severed, while here the sentence retains the officer in the service, keeping him amenable to military law. It is thought by the court that while these relations continue, *237 bis inaction does not preclude bim from questioning tbe legality of bis sentence.
Upon tbe question whether tbe claimant is entitled to recover allowances under tbe terms of bis sentence, upon tbe ground tbat only half of bis monthly pay was ordered to be forfeited, tbe court is of tbe opinion tbat where an officer is suspended from duty be is not entitled to allowance.
Tbe judgment of tbe court is tbat tbe petition be dismissed.