# PARKER, WARDEN, ET AL. *v.* LEVY

No. 73–206.  Argued February 20, 1974—Decided June 19, 1974

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. BLACKMUN, J., filed a concurring statement, in which BURGER, C. J., joined, *post*, p. 762. DOUGLAS, J., filed a dissenting opinion, *post*, p. 766. STEWART, J., filed a dissenting opinion, in which DOUGLAS and BRENNAN, JJ., joined, *post*, p. 773. MARSHALL, J., took no part in the consideration or decision of the case.

*Solicitor General Bork* argued the cause for appellants. With him on the brief were *Assistant Attorney General Petersen, Allan A. Tuttle,* and *Jerome M. Feit.*

*Charles Morgan, Jr.,* argued the cause for appellee. With him on the brief were *Norman Siegel, Laughlin McDonald, Morris Brown, Neil Bradley, Reber F. Boult, Jr., Anthony G. Amsterdam, Alan H. Levine, Burt Neuborne, Melvin L. Wulf,* and *Henry W. Sawyer III.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Appellee Howard Levy, a physician, was a captain in the Army stationed at Fort Jackson, South Carolina.

---

*Briefs of *amici curiae* urging affirmance were filed by *Marvin M. Karpatkin* and *Thomas M. Comerford* for the Association of the Bar of the City of New York, and by *Joseph H. Sharlitt* and *Neal E. Krucoff* for Richard G. Augenblick.

He had entered the Army under the so-called "Berry Plan," [1] under which he agreed to serve for two years in the Armed Forces if permitted first to complete his medical training. From the time he entered on active duty in July 1965 until his trial by court-martial, he was assigned as Chief of the Dermatological Service of the United States Army Hospital at Fort Jackson. On June 2, 1967, appellee was convicted by a general court-martial of violations of Arts. 90, 133, and 134 of the Uniform Code of Military Justice, and sentenced to dismissal from the service, forfeiture of all pay and allowances, and confinement for three years at hard labor.

The facts upon which his conviction rests are virtually undisputed. The evidence admitted at his court-martial trial showed that one of the functions of the hospital to which appellee was assigned was that of training Special Forces aide men. As Chief of the Dermatological Service, appellee was to conduct a clinic for those aide men. In the late summer of 1966, it came to the attention of the hospital commander that the dermatology training of the students was unsatisfactory. After investigating the program and determining that appellee had totally neglected his duties, the commander called appellee to his office and personally handed him a written order to conduct the training. Appellee read the order, said that he understood it, but declared that he would not obey it because of his medical ethics. Appellee persisted in his refusal to obey the order, and later reviews of the program established that the training was still not being carried out.

During the same period of time, appellee made several public statements to enlisted personnel at the post, of which the following is representative:

"The United States is wrong in being involved in

---

[1] See 50 U. S. C. App. § 454 (j).

the Viet Nam War. I would refuse to go to Viet Nam if ordered to do so. I don't see why any colored soldier would go to Viet Nam: they should refuse to go to Viet Nam and if sent should refuse to fight because they are discriminated against and denied their freedom in the United States, and they are sacrificed and discriminated against in Viet Nam by being given all the hazardous duty and they are suffering the majority of casualties. If I were a colored soldier I would refuse to go to Viet Nam and if I were a colored soldier and were sent I would refuse to fight. Special Forces personnel are liars and thieves and killers of peasants and murderers of women and children."

Appellee's military superiors originally contemplated nonjudicial proceedings against him under Art. 15 of the Uniform Code of Military Justice, 10 U. S. C. § 815, but later determined that court-martial proceedings were appropriate. The specification under Art. 90 alleged that appellee willfully disobeyed the hospital commandant's order to establish the training program, in violation of that article, which punishes anyone subject to the Uniform Code of Military Justice who "willfully disobeys a lawful command of his superior commissioned officer." [2] Statements to enlisted personnel were

---

[2] Article 90 of the Uniform Code of Military Justice, 10 U. S. C. § 890, provides:

"Any person subject to this chapter who—

"(1) strikes his superior commissioned officer or draws or lifts up any weapon or offers any violence against him while he is in the execution of his office; or

"(2) willfully disobeys a lawful command of his superior commissioned officer;

"shall be punished, if the offense is committed in time of war, by death or such other punishment as a court-martial may direct, and

listed as specifications under the charges of violating Arts. 133 and 134 of the Code. Article 133 provides for the punishment of "conduct unbecoming an officer and a gentleman," [3] while Art. 134 proscribes, *inter alia*, "all disorders and neglects to the prejudice of good order and discipline in the armed forces." [4]

The specification under Art. 134 alleged that appellee "did, at Fort Jackson, South Carolina, . . . with design to promote disloyalty and disaffection among the troops, publicly utter [certain] statements to divers enlisted personnel at divers times . . . ." [5] The specification under

---

if the offense is committed at any other time, by such punishment, other than death, as a court-martial may direct."

[3] Article 133 of the Uniform Code of Military Justice, 10 U. S. .C. § 933, provides:

"Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

[4] Article 134 of the Uniform Code of Military Justice, 10 U. S. C. § 934, provides:

"Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."

[5] The specification under Art. 134 (Charge II) alleged in full:

"In that Captain Howard B. Levy, U. S. Army, Headquarters and Headquarters Company, United States Army Hospital, Fort Jackson, South Carolina, did, at Fort Jackson, South Carolina, on or about the period February 1966 to December 1966, with design to promote disloyalty and disaffection among the troops, publicly utter the following statements to divers enlisted personnel at divers times: 'The United States is wrong in being involved in the Viet Nam War. I would refuse to go to Viet Nam if ordered to do so. I don't see why any colored soldier would go to Viet Nam; they should refuse to go to Viet Nam and if sent should refuse to fight because they are

Art. 133 alleged that appellee did "while in the performance of his duties at the United States Army Hospital . . . wrongfully and dishonorably" make statements variously described as intemperate, defamatory, provoking, disloyal, contemptuous, and disrespectful to Special Forces personnel and to enlisted personnel who were patients or under his supervision.[6]

discriminated against and denied their freedom in the United States, and they are sacrificed and discriminated against in Viet Nam by being given all the hazardous duty and they are suffering the majority of casualties. If I were a colored soldier I would refuse to go to Viet Nam and if I were a colored soldier and were sent I would refuse to fight. Special Forces personnel are liars and thieves and killers of peasants and murderers of women and children,' or words to that effect, which statements were disloyal to the United States, to the prejudice of good order and discipline in the armed forces."

[6] The specification under Art. 133 (Additional Charge I) alleged that appellee

"did . . . at divers times during the period from on or about February 1966 to on or about December 1966 while in the performance of his duties at the United States Army Hospital, Fort Jackson, South Carolina, wrongfully and dishonorably make the following statements of the nature and to and in the presence and hearing of the persons as hereinafter more particularly described, to wit: (1) Intemperate, defamatory, provoking, and disloyal statements to special forces enlisted personnel present for training in the United States Army Hospital, Fort Jackson, South Carolina, and in the presence and hearing of other enlisted personnel, both patients and those performing duty under his immediate supervision and control and dependent patients as follows: 'I will not train special forces personnel because they are "liars and thieves," "killers of peasants," and "murderers of women and children," ' or words to that effect; (2) Intemperate and disloyal statements to enlisted personnel, both patients and those performing duty under his immediate supervision and control as follows: 'I would refuse to go to Vietnam if ordered to do so. I do not see why any colored soldier would go to Vietnam. They should refuse to go to Vietnam; and, if sent, they should refuse to fight because they are discriminated against and denied their freedom in the United States and they are sacrificed and

Appellee was convicted by the court-martial, and his conviction was sustained on his appeals within the military.[7] After he had exhausted this avenue of relief, he sought federal habeas corpus in the United States District Court for the Middle District of Pennsylvania, challenging his court-martial conviction on a number of grounds. The District Court, on the basis of the voluminous record of the military proceedings and the argument of counsel, denied relief. It held that the "various articles of the Uniform Code of Military Justice are not unconstitutional for vagueness," citing several decisions

discriminated against in Vietnam by being given all the hazardous duty, and they are suffering the majority of casualties. If I were a colored soldier, I would refuse to go to Vietnam; and, if I were a colored soldier and if I were sent to Vietnam, I would refuse to fight', or words to that effect; (3) Intemperate, contemptuous, and disrespectful statements to enlisted personnel performing duty under his immediate supervision and control, as follows: 'The Hospital Commander has given me an order to train special forces personnel, which order I have refused and will not obey,' or words to that effect; (4) Intemperate, defamatory, provoking, and disloyal statements to special forces personnel in the presence and hearing of enlisted personnel performing duty under his immediate supervision and control, as follows: 'I hope when you get to Vietnam something happens to you and you are injured,' or words to that effect; all of which statements were made to persons who knew that the said Howard B. Levy was a commissioned officer in the active service of the United States Army."

[7] *United States* v. *Levy*, CM 416463, 39 C. M. R. 672 (1968), petition for review denied, No. 21,641, 18 U. S. C. M. A. 627 (1969). Appellee also unsuccessfully sought relief in the civilian courts. *Levy* v. *Corcoran*, 128 U. S. App. D. C. 388, 389 F. 2d 929, application for stay denied, 387 U. S. 915, cert. denied, 389 U. S. 960 (1967); *Levy* v. *Resor*, 17 U. S. C. M. A. 135, 37 C. M. R. 399 (1967); *Levy* v. *Resor*, Civ. No. 67–442 (SC July 5, 1967), aff'd *per curiam*, 384 F. 2d 689 (CA4 1967), cert. denied, 389 U. S. 1049 (1968); *Levy* v. *Dillon*, 286 F. Supp. 593 (Kan. 1968), aff'd, 415 F. 2d 1263 (CA10 1969).

of the United States Court of Military Appeals.[8]   The court rejected the balance of appellee's claims without addressing them individually, noting that the military tribunals had given fair consideration to them and that the role of the federal courts in reviewing court-martial proceedings was a limited one.

The Court of Appeals reversed, holding in a lengthy opinion that Arts. 133 and 134 are void for vagueness.   478 F. 2d 772 (CA3 1973).   The court found little difficulty in concluding that "as measured by contemporary standards of vagueness applicable to statutes and ordinances governing civilians," the general articles "do not pass constitutional muster."   It relied on such cases as *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972); *Papachristou* v. *City of Jacksonville,* 405 U. S. 156 (1972); *Giaccio* v. *Pennsylvania,* 382 U. S. 399 (1966); *Coates* v. *City of Cincinnati,* 402 U. S. 611 (1971), and *Gelling* v. *Texas,* 343 U. S. 960 (1952). The Court of Appeals did not rule that appellee was punished for doing things he could not reasonably have known constituted conduct proscribed by Art. 133 or 134.   Indeed, it recognized that his conduct fell within one of the examples of Art. 134 violations contained in the Manual for Courts-Martial, promulgated by the President by Executive Order.[9]   Nonetheless, relying chiefly on *Gooding* v. *Wilson,* 405 U. S. 518 (1972), the Court found the possibility that Arts. 133 and 134 would be applied to future conduct of others as to which there was insufficient warning, or which was within the area of protected First Amendment expression, was enough to give

---

[8] *United States* v. *Howe,* 17 U. S. C. M. A. 165, 37 C. M. R. 429 (1967); *United States* v. *Sadinsky,* 14 U. S. C. M. A. 563, 34 C. M. R. 343 (1964); *United States* v. *Frantz,* 2 U. S. C. M. A. 161, 7 C. M. R. 37 (1953).

[9] Manual for Courts-Martial ¶ 213f (5) (1969).

appellee standing to challenge both articles on their face. While it acknowledged that different standards might in some circumstances be applicable in considering vagueness challenges to provisions which govern the conduct of members of the Armed Forces, the Court saw in the case of Arts. 133 and 134 no "countervailing military considerations which justify the twisting of established standards of due process in order to hold inviolate these articles, so clearly repugnant under current constitutional values." Turning finally to appellee's conviction under Art. 90, the Court held that the joint consideration of Art. 90 charges with the charges under Arts. 133 and 134 gave rise to a "reasonable possibility" that appellee's right to a fair trial was prejudiced, so that a new trial was required.

Appellants appealed to this Court pursuant to 28 U. S. C. § 1252. We set the case for oral argument, and postponed consideration of the question of our jurisdiction to the hearing on the merits. 414 U. S. 973 (1973).[10]

---

[10] Title 28 U. S. C. § 1252 provides in pertinent part that "[a]ny party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States, . . . holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party. . . ." In his motion to dismiss or affirm, appellee urged a lack of jurisdiction in this Court because the attorneys who filed and served the notice of appeal were not attorneys of record and because the attorney effecting service failed to comply with Rule 33.3 (c) of this Court requiring persons not admitted to the Bar of this Court to prove service by affidavit, rather than by certificate. Appellee alternatively contended that 28 U. S. C. § 1252 was not intended to permit appeals from the courts of appeals, but only from the district courts. We postponed consideration of the jurisdictional question to the hearing on the merits. Appellee now renews his contentions that the asserted defects in appellants' filing of their

## I

This Court has long recognized that the military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 17 (1955). In *In re Grimley,* 137 U. S. 147, 153 (1890), the Court ob-

notice of appeal should be treated as a failure to file a timely notice of appeal, and that the appeal must accordingly be dismissed. See, *e. g., Territo* v. *United States,* 358 U. S. 279 (1959); *Department of Banking* v. *Pink,* 317 U. S. 264, 268 (1942). He also urges that the question whether an appeal may be taken to this Court from the Court of Appeals under 28 U. S. C. § 1252 presents a question of first impression.

We hold that "any court of the United States," as used in § 1252, includes the courts of appeals. The Reviser's Note for § 1252 states that the "term 'any court of the United States' includes the courts of appeals . . . ." The definitional section of Title 28, 28 U. S. C. § 451, provides: "As used in this title: The term 'court of the United States' includes the Supreme Court of the United States, courts of appeals, district courts . . . ." Our reading of § 1252 is further supported by that section's legislative history. Section 1252 was originally enacted as § 2 of the Act of August 24, 1937, c. 754, 50 Stat. 751. Section 5 of that same Act defined "any court of the United States" to include any "circuit court of appeals." We also find no merit in appellee's contention that the asserted defects in appellants' notice of appeal deprive this Court of jurisdiction. As appellants note, appellee makes no claim that he did not have actual notice of the filing of the notice of appeal. Assuming that there was technical noncompliance with Rule 33 of this Court for the reasons urged by appellee, that noncompliance does not deprive this Court of jurisdiction. Cf. *Taglianetti* v. *United States,* 394 U. S. 316 n. 1 (1969); *Heflin* v. *United States,* 358 U. S. 415, 418 n. 7 (1959).

served: "An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." More recently we noted that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff* v. *Willoughby,* 345 U. S. 83, 94 (1953), and that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . . ." *Burns* v. *Wilson,* 346 U. S. 137, 140 (1953) (plurality opinion). We have also recognized that a military officer holds a particular position of responsibility and command in the Armed Forces:

"The President's commission . . . recites that 'reposing special trust and confidence in the patriotism, valor, fidelity and abilities' of the appointee he is named to the specified rank during the pleasure of the President." *Orloff* v. *Willoughby, supra,* at 91.

Just as military society has been a society apart from civilian society, so "[m]ilitary law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns* v. *Wilson, supra,* at 140. And to maintain the discipline essential to perform its mission effectively, the military has developed what "may not unfitly be called the customary military law" or "general usage of the military service." *Martin* v. *Mott,* 12 Wheat. 19, 35 (1827). As the opinion in *Martin* v. *Mott* demonstrates, the Court has approved the enforcement of those military customs and usages by courts-martial from the early days of this Nation:

". . . Courts Martial, when duly organized, are bound to execute their duties, and regulate their modes of proceeding, in the absence of positive enactments.

> Upon any other principle, Courts Martial would be
> left without any adequate means to exercise the
> authority confided to them: for there could scarcely
> be framed a positive code to provide for the infinite
> variety of incidents applicable to them." *Id.*, at
> 35–36.

An examination of the British antecedents of our military law shows that the military law of Britain had long contained the forebears of Arts. 133 and 134 in remarkably similar language. The Articles of the Earl of Essex (1642) provided that "[a]ll other faults, disorders and offenses, not mentioned in these Articles, shall be punished according to the general customs and laws of war." One of the British Articles of War of 1765 made punishable "all Disorders or Neglects . . . to the Prejudice of good Order and Military Discipline . . ." that were not mentioned in the other articles.[11] Another of those articles provided:

> "Whatsoever Commissioned Officer shall be con-
> victed before a General Court-martial, of behaving
> in a scandalous infamous Manner, such as is unbe-
> coming the Character of an Officer and a Gentleman,
> shall be discharged from Our Service."[12]

In 1775 the Continental Congress adopted this last article, along with 68 others for the governance of its army.[13] The following year it was resolved by the Congress that "the committee on spies be directed to revise the rules and articles of war; this being a committee of five, consisting of John Adams, Thomas Jefferson, John

---

[11] Section XX, Art. III, of the British Articles of War of 1765; W. Winthrop, Military Law and Precedents 946 (2d ed. 1920).

[12] Section XV, Art. XXIII, of the British Articles of War of 1765; Winthrop, *supra*, at 945.

[13] Article XLVII of the American Articles of War of 1775; Winthrop, *supra*, at 957.

Rutledge, James Wilson and R. R. Livingston . . . ."[14]
The article was included in the new set of articles prepared
by the Committee, which Congress adopted on Septem-
ber 20, 1776.[15] After being once more re-enacted
without change in text in 1786, it was revised and
expanded in 1806, omitting the terms "scandalous" and
"infamous," so as to read:

> "Any commissioned officer convicted before a
> general court-martial of conduct unbecoming an offi-
> cer and a gentleman, shall be dismissed [from] the
> service."[16]

From 1806, it remained basically unchanged through
numerous congressional re-enactments until it was enacted
as Art. 133 of the Uniform Code of Military Justice in
1951.

The British article punishing "all Disorders and Ne-
glects . . ." was also adopted by the Continental Congress
in 1775 and re-enacted in 1776.[17] Except for a revision in
1916, which added the clause punishing "all conduct of a
nature to bring discredit upon the military service,"[18]
substantially the same language was preserved through-
out the various re-enactments of this article too, until
in 1951 it was enacted as Art. 134 of the Uniform Code
of Military Justice.

Decisions of this Court during the last century have
recognized that the longstanding customs and usages

---

[14] *Id.*, at 22.

[15] Article 21 of Section XIV of the American Articles of War of
1776; Winthrop, *supra*, at 969.

[16] Article 83 of Section 1 of the American Articles of War of 1806;
Winthrop, *supra*, at 983.

[17] Article L of the American Articles of War of 1775; Art. 5 of
section XVIII of the American Articles of War of 1776; Winthrop,
*supra*, at 957, 971.

[18] Act of Aug. 29, 1916, c. 418, 39 Stat. 619, 666.

of the services impart accepted meaning to the seemingly imprecise standards of Arts. 133 and 134. In *Dynes* v. *Hoover,* 20 How. 65 (1857), this Court upheld the Navy's general article, which provided that "[a]ll crimes committed by persons belonging to the navy, which are not specified in the foregoing articles, shall be punished according to the laws and customs in such cases at sea." The Court reasoned:

> "[W]hen offences and crimes are not given in terms or by definition, the want of it may be supplied by a comprehensive enactment, such as the 32d article of the rules for the government of the navy, which means that courts martial have jurisdiction of such crimes as are not specified, but which have been recognised to be crimes and offences by the usages in the navy of all nations, and that they shall be punished according to the laws and customs of the sea. Notwithstanding the apparent indeterminateness of such a provision, it is not liable to abuse; for what those crimes are, and how they are to be punished, is well known by practical men in the navy and army, and by those who have studied the law of courts martial, and the offences of which the different courts martial have cognizance." *Id.,* at 82.

In *Smith* v. *Whitney,* 116 U. S. 167 (1886), this Court refused to issue a writ of prohibition against Smith's court-martial trial on charges of "[s]candalous conduct tending to the destruction of good morals" and "[c]ulpable inefficiency in the performance of duty." The Court again recognized the role of "the usages and customs of war" and "old practice in the army" in the interpretation of military law by military tribunals. *Id.,* at 178–179.

In *United States* v. *Fletcher,* 148 U. S. 84 (1893), the Court considered a court-martial conviction under what is

748

now Art. 133, rejecting Captain Fletcher's claim that the court-martial could not properly have held that his refusal to pay a just debt was "conduct unbecoming an officer and a gentleman." The Court of Claims decision which the Court affirmed in *Fletcher* stressed the military's "higher code termed honor, which holds its society to stricter accountability"[19] and with which those trained only in civilian law are unfamiliar. In *Swaim* v. *United States,* 165 U. S. 553 (1897), the Court affirmed another Court of Claims decision, this time refusing to disturb a court-martial conviction for conduct "to the prejudice of good order and military discipline" in violation of the Articles of War. The Court recognized the role of "unwritten law or usage" in giving meaning to the language of what is now Art. 134. In rejecting Swaim's argument that the evidence failed to establish an offense under the article, the Court said:

> "[T]his is the very matter that falls within the province of courts-martial, and in respect to which their conclusions cannot be controlled or reviewed by the civil courts. As was said in *Smith* v. *Whitney,* 116 U. S. 178, 'of questions not depending upon the construction of the statutes, but upon unwritten military law or usage, within the jurisdiction of courts-martial, military or naval officers, from their training and experience in the service, are more competent judges than the courts of common law.' " 165 U. S., at 562.

The Court of Claims had observed that cases involving "conduct to the prejudice of good order and military discipline," as opposed to conduct unbecoming an officer, "are still further beyond the bounds of ordinary judicial judgment, for they are not measurable by our innate

---

[19] *Fletcher* v. *United States,* 26 Ct. Cl. 541, 563 (1891).

sense of right and wrong, of honor and dishonor, but must be gauged by an actual knowledge and experience of military life, its usages and duties." [20]

## II

The differences noted by this settled line of authority, first between the military community and the civilian community, and second between military law and civilian law, continue in the present day under the Uniform Code of Military Justice. That Code cannot be equated to a civilian criminal code. It, and the various versions of the Articles of War which have preceded it, regulate aspects of the conduct of members of the military which in the civilian sphere are left unregulated. While a civilian criminal code carves out a relatively small segment of potential conduct and declares it criminal, the Uniform Code of Military Justice essays more varied regulation of a much larger segment of the activities of the more tightly knit military community. In civilian life there is no legal sanction—civil or criminal—for failure to behave as an officer and a gentleman; in the military world, Art. 133 imposes such a sanction on a commissioned officer. The Code likewise imposes other sanctions for conduct that in civilian life is not subject to criminal penalties: disrespect toward superior commissioned officers, Art. 89, 10 U. S. C. § 889; cruelty toward, or oppression or maltreatment of subordinates, Art. 93, 10 U. S. C. § 893; negligent damaging, destruction, or wrongful disposition of military property of the United States, Art. 108, 10 U. S. C. § 908; improper hazarding of a vessel, Art. 110, 10 U. S. C. § 910; drunkenness on duty, Art. 112, 10 U. S. C. § 912; and malingering, Art. 115, 10 U. S. C. § 915.

But the other side of the coin is that the penalties provided in the Code vary from death and substantial

[20] *Swaim* v. *United States,* 28 Ct. Cl. 173, 228 (1893).

penal confinement at one extreme to forms of administrative discipline which are below the threshold of what would normally be considered a criminal sanction at the other. Though all of the offenses described in the Code are punishable "as a court-martial may direct," and the accused may demand a trial by court-martial,[21] Art. 15 of the Code also provides for the imposition of nonjudicial "disciplinary punishments" for minor offenses without the intervention of a court-martial. 10 U. S. C. § 815. The punishments imposable under that article are of a limited nature. With respect to officers, punishment may encompass suspension of duty, arrest in quarters for not more than 30 days, restriction for not more than 60 days, and forfeiture of pay for a limited period of time. In the case of enlisted men, such punishment may additionally include, among other things, reduction to the next inferior pay grade, extra fatigue duty, and correctional custody for not more than seven consecutive days. Thus, while legal proceedings actually brought before a court-martial are prosecuted in the name of the Government, and the accused has the right to demand that he be proceeded against in this manner before any sanctions may be imposed upon him, a range of minor sanctions for lesser infractions are often imposed administratively. Forfeiture of pay, reduction in rank, and even dismissal from the service bring to mind the law of labor-management relations as much as the civilian criminal law.

In short, the Uniform Code of Military Justice regulates a far broader range of the conduct of military personnel than a typical state criminal code regulates of the conduct of civilians; but at the same time the enforcement of that Code in the area of minor offenses

---

[21] Art. 15 (a), 10 U. S. C. § 815 (a).

is often by sanctions which are more akin to administrative or civil sanctions than to civilian criminal ones.

The availability of these lesser sanctions is not surprising in view of the different relationship of the Government to members of the military. It is not only that of lawgiver to citizen, but also that of employer to employee. Indeed, unlike the civilian situation, the Government is often employer, landlord, provisioner, and lawgiver rolled into one. That relationship also reflects the different purposes of the two communities. As we observed in *In re Grimley*, 137 U. S., at 153, the military "is the executive arm" whose "law is that of obedience." While members of the military community enjoy many of the same rights and bear many of the same burdens as do members of the civilian community, within the military community there is simply not the same autonomy as there is in the larger civilian community. The military establishment is subject to the control of the civilian Commander in Chief and the civilian departmental heads under him, and its function is to carry out the policies made by those civilian superiors.

Perhaps because of the broader sweep of the Uniform Code, the military makes an effort to advise its personnel of the contents of the Uniform Code, rather than depending on the ancient doctrine that everyone is presumed to know the law. Article 137 of the Uniform Code, 10 U. S. C. § 937, requires that the provisions of the Code be "carefully explained to each enlisted member at the time of his entrance on active duty, or within six days thereafter" and that they be "explained again after he has completed six months of active duty . . . ." Thus the numerically largest component of the services, the enlisted personnel, who might be expected to be a good deal less familiar with the Uniform Code than commissioned officers, are required by its terms

to receive instructions in its provisions. Article 137 further provides that a complete text of the Code and of the regulations prescribed by the President "shall be made available to any person on active duty, upon his request, for his personal examination."

With these very significant differences between military law and civilian law and between the military community and the civilian community in mind, we turn to appellee's challenges to the constitutionality of Arts. 133 and 134.

### III

Appellee urges that both Art. 133 and Art. 134 (the general article) are "void for vagueness" under the Due Process Clause of the Fifth Amendment and overbroad in violation of the First Amendment. We have recently said of the vagueness doctrine:

> "The doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.' Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith* v. *Goguen,* 415 U. S. 566, 572–573 (1974).

Each of these articles has been construed by the United States Court of Military Appeals or by other military authorities in such a manner as to at least partially narrow its otherwise broad scope.

The United States Court of Military Appeals has stated that Art. 134 must be judged "not in vacuo, but in the context in which the years have placed it," *United States* v. *Frantz,* 2 U. S. C. M. A. 161, 163, 7

C. M. R. 37, 39 (1953). Article 134 does not make "every irregular, mischievous, or improper act a court-martial offense," *United States* v. *Sadinsky,* 14 U. S. C. M. A. 563, 565, 34 C. M. R. 343, 345 (1964), but its reach is limited to conduct that is " 'directly and palpably—as distinguished from indirectly and remotely—prejudicial to good order and discipline.' " *Ibid.; United States* v. *Holiday,* 4 U. S. C. M. A. 454, 456, 16 C. M. R. 28, 30 (1954). It applies only to calls for active opposition to the military policy of the United States, *United States* v. *Priest,* 21 U. S. C. M. A. 564, 45 C. M. R. 338 (1972), and does not reach all "[d]isagreement with, or objection to, a policy of the Government." *United States* v. *Harvey,* 19 U. S. C. M. A. 539, 544, 42 C. M. R. 141, 146 (1971).

The Manual for Courts-Martial restates these limitations on the scope of Art. 134.[22]   It goes on to say that "[c]ertain disloyal statements by military personnel" may be punishable under Art. 134.   "Examples are utterances designed to promote disloyalty or disaffection among troops, as praising the enemy, attacking the war aims of the United States, or denouncing our form of government."[23]   Extensive additional interpretative materials are contained in the portions of the Manual devoted to Art. 134, which describe more than sixty illustrative offenses.

The Court of Military Appeals has likewise limited the scope of Art. 133.   Quoting from W. Winthrop, Military Law and Precedents 711–712 (2d ed. 1920), that court has stated:

> " ' ". . . To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect.

---

[22] Manual for Courts-Martial ¶ 213c (1969).

[23] *Id.,* ¶ 213f (5).

Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents." ' " *United States* v. *Howe,* 17 U. S. C. M. A. 165, 177–178, 37 C. M. R. 429, 441–442 (1967).

The effect of these constructions of Arts. 133 and 134 by the Court of Military Appeals and by other military authorities has been twofold: It has narrowed the very broad reach of the literal language of the articles, and at the same time has supplied considerable specificity by way of examples of the conduct which they cover. It would be idle to pretend that there are not areas within the general confines of the articles' language which have been left vague despite these narrowing constructions. But even though sizable areas of uncertainty as to the coverage of the articles may remain after their official interpretation by authoritative military sources, further content may be supplied even in these areas by less formalized custom and usage. *Dynes* v. *Hoover,* 20 How. 65 (1857). And there also cannot be the slightest doubt under the military precedents that there is a substantial range of conduct to which both articles clearly apply without vagueness or imprecision. It is within that range that appellee's conduct squarely falls, as the Court of Appeals recognized:

"Neither are we unmindful that the *Manual for Courts-Martial* offers as an example of an offense under Article 134, 'praising the enemy, attacking the war aims of the United States, or denouncing our form of government.' With the possible exception of the statement that 'Special Forces personnel are liars

and thieves and killers of peasants and murderers of women and children,' it would appear that each statement for which [Levy] was court-martialed could fall within the example given in the *Manual*." 478 F. 2d, at 794.

The Court of Appeals went on to hold, however, that even though Levy's own conduct was clearly prohibited, the void-for-vagueness doctrine conferred standing upon him to challenge the imprecision of the language of the articles as they might be applied to hypothetical situations outside the considerable area within which their applicability was similarly clear.

We disagree with the Court of Appeals both in its approach to this question and in its resolution of it. This Court has on more than one occasion invalidated statutes under the Due Process Clause of the Fifth or Fourteenth Amendment because they contained no standard whatever by which criminality could be ascertained, and the doctrine of these cases has subsequently acquired the shorthand description of "void for vagueness." *Lanzetta* v. *New Jersey,* 306 U. S. 451 (1939); *Winters* v. *New York,* 333 U. S. 507 (1948). In these cases, the criminal provision is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates* v. *City of Cincinnati,* 402 U. S. 611, 614 (1971).

But the Court of Appeals found in this case, and we agree, that Arts. 133 and 134 are subject to no such sweeping condemnation. Levy had fair notice from the language of each article that the particular conduct which he engaged in was punishable. This is a case, then, of the type adverted to in *Smith* v. *Goguen,* in which the statutes "by their terms or as authorita-

tively construed apply without question to certain activities, but whose application to other behavior is uncertain." 415 U. S., at 578. The result of the Court of Appeals' conclusion that Levy had standing to challenge the vagueness of these articles as they might be hypothetically applied to the conduct of others, even though he was squarely within their prohibitions, may stem from a blending of the doctrine of vagueness with the doctrine of overbreadth, but we do not believe it is supported by prior decisions of this Court.

We have noted in *Smith* v. *Goguen, id.,* at 573, that more precision in drafting may be required because of the vagueness doctrine in the case of regulation of expression. For the reasons which differentiate military society from civilian society, we think Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter. But each of these differentiations relates to how strict a test of vagueness shall be applied in judging a particular criminal statute. None of them suggests that one who has received fair warning of the criminality of his own conduct from the statute in question is nonetheless entitled to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.

Because of the factors differentiating military society from civilian society, we hold that the proper standard of review for a vagueness challenge to the articles of the Code is the standard which applies to criminal statutes regulating economic affairs. Clearly, that standard is

met here, for as the Court stated in *United States* v. *National Dairy Corp.*, 372 U. S. 29, 32–33 (1963):

"The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. *E. g., Jordan* v. *De George*, 341 U. S. 223, 231 (1951), and *United States* v. *Petrillo*, 332 U. S. 1, 7 (1947). Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation. *E. g., United States* v. *Rumely*, 345 U. S. 41, 47 (1953); *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); see *Screws* v. *United States*, 325 U. S. 91 (1945).

"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. *United States* v. *Harriss*, 347 U. S. 612; 617 (1954). In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged. *Robinson* v. *United States*, 324 U. S. 282 (1945)."

Since appellee could have had no reasonable doubt that his public statements urging Negro enlisted men not to go to Vietnam if ordered to do so were both "unbecoming an officer and a gentleman," and "to the prejudice of good order and discipline in the armed forces," in violation of the provisions of Arts. 133 and 134, respectively, his challenge to them as unconstitutionally vague under the Due Process Clause of the Fifth Amendment must fail.

We likewise reject appellee's contention that Arts. 133 and 134 are facially invalid because of their "over-

breadth." In *Gooding* v. *Wilson,* 405 U. S., at 520–521, the Court said:

"It matters not that the words appellee used might have been constitutionally prohibited under a narrowly and precisely drawn statute. At least when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' *Dombrowski* v. *Pfister,* 380 U. S. 479, 491 (1965), the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity'. . . ."

While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it. Doctrines of First Amendment overbreadth asserted in support of challenges to imprecise language like that contained in Arts. 133 and 134 are not exempt from the operation of these principles. The United States Court of Military Appeals has sensibly expounded the reason for this different application of First Amendment doctrines in its opinion in *United States* v. *Priest,* 21 U. S. C. M. A., at 570, 45 C. M. R., at 344:

"In the armed forces some restrictions exist for reasons that have no counterpart in the ci-

vilian community. Disrespectful and contemptuous speech, even advocacy of violent change, is tolerable in the civilian community, for it does not directly affect the capacity of the Government to discharge its responsibilities unless it both is directed to inciting imminent lawless action and is likely to produce such action. Brandenburg v. Ohio, [395 U. S. 444 (1969)]. In military life, however, other considerations must be weighed. The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected. United States v. Gray, [20 U. S. C. M. A. 63, 42 C. M. R. 255 (1970)]."

In *Broadrick* v. *Oklahoma,* 413 U. S. 601, 610 (1973), we said that "[e]mbedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." We further commented in that case that "[i]n the past, the Court has recognized some limited exceptions to these principles, but only because of the most 'weighty countervailing policies.'" *Id.,* at 611. One of those exceptions "has been carved out in the area of the First Amendment." *Ibid.* In the First Amendment context attacks have been permitted "on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity," *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965).

This Court has, however, repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the "remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . . ." *CSC* v. *Letter Carriers,* 413 U. S. 548, 580–581 (1973). And the Court recognized in *Broadrick, supra,* that "where conduct and not merely speech is involved" the overbreadth must "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." 413 U. S., at 615. Here, as the Manual makes clear, both Art. 133 and Art. 134 do prohibit a "whole range of easily identifiable and constitutionally proscribable . . . conduct."

Both *Broadrick* and *Letter Carriers* involved basically noncriminal sanctions imposed on federal and state employees who were otherwise civilians. The Uniform Code of Military Justice applies a series of sanctions, varying from severe criminal penalties to administratively imposed minor sanctions, upon members of the military. However, for the reasons dictating a different application of First Amendment principles in the military context described above, we think that the " 'weighty countervailing policies,' " *Broadrick, supra,* at 611, which permit the extension of standing in First Amendment cases involving civilian society, must be accorded a good deal less weight in the military context.

There is a wide range of the conduct of military personnel to which Arts. 133 and 134 may be applied without infringement of the First Amendment. While there may lurk at the fringes of the articles, even in the light of their narrowing construction by the United

States Court of Military Appeals, some possibility that conduct which would be ultimately held to be protected by the First Amendment could be included within their prohibition, we deem this insufficient to invalidate either of them at the behest of appellee. His conduct, that of a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat, was unprotected under the most expansive notions of the First Amendment. Articles 133 and 134 may constitutionally prohibit that conduct, and a sufficiently large number of similar or related types of conduct so as to preclude their invalidation for overbreadth.

## IV

Appellee urges that should we disagree with the Court of Appeals as to the constitutionality of Arts. 133 and 134, we should nonetheless affirm its judgment by invalidating his conviction under Art. 90. He contends that to carry out the hospital commandant's order to train aide men in dermatology would have constituted participation in a war crime, and that the commandant gave the order in question, knowing that it would be disobeyed, for the sole purpose of increasing the punishment which could be imposed upon appellee. The Court of Appeals observed that each of these defenses was recognized under the Uniform Code of Military Justice, but had been resolved against appellee on a factual basis by the court-martial which convicted him. The court went on to say that:

> "In isolation, these factual determinations adverse to appellant under an admittedly valid article are not of constitutional significance and resultantly, are beyond our scope of review." 478 F. 2d, at 797.

See *Whelchel* v. *McDonald*, 340 U. S. 122 (1950). We agree with the Court of Appeals.

Appellee in his brief here mounts a number of alternative attacks on the sentence imposed by the court-martial, attacks which were not treated by the Court of Appeals in its opinion in this case. To the extent that these points were properly presented to the District Court and preserved on appeal to the Court of Appeals, and to the extent that they are open on federal habeas corpus review of court-martial convictions under *Burns* v. *Wilson,* 346 U. S. 137 (1953), we believe they should be addressed by the Court of Appeals in the first instance.

*Reversed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring.

I wholly concur in the Court's opinion. I write only to state what for me is a crucial difference between the majority and dissenting views in this case. My Brother STEWART complains that men of common intelligence must necessarily speculate as to what "conduct unbecoming an officer and a gentleman" or conduct to the "prejudice of good order and discipline in the armed forces" or conduct "of a nature to bring discredit upon the armed forces" really means. He implies that the average soldier or sailor would not reasonably expect, under the general articles, to suffer military reprimand or punishment for engaging in sexual acts with a chicken, or window peeping in a trailer park, or cheating while calling bingo numbers. *Post,* at 779. He argues that "times have surely changed" and that the articles are "so vague and uncertain as to be incomprehensible to the servicemen who are to be governed by them." *Post,* at 781, 788.

These assertions are, of course, no less judicial fantasy than that which the dissent charges the majority of in-

dulging. In actuality, what is at issue here are concepts of "right" and "wrong" and whether the civil law can accommodate, in special circumstances, a system of law which expects more of the individual in the context of a broader variety of relationships than one finds in civilian life.

In my judgment, times have not changed in the area of moral precepts. Fundamental concepts of right and wrong are the same now as they were under the Articles of the Earl of Essex (1642), or the British Articles of War of 1765, or the American Articles of War of 1775, or during the long line of precedents of this and other courts upholding the general articles. And, however unfortunate it may be, it is still necessary to maintain a disciplined and obedient fighting force.

A noted commentator, Professor Bishop of Yale, has recently stated that "[a]lmost all of the acts actually charged under [Articles 133 and 134], notably drug offenses, are of a sort which ordinary soldiers know, or should know, to be punishable." J. Bishop, Justice Under Fire 87–88 (1974). I agree. The subtle airs that govern the command relationship are not always capable of specification. The general articles are essential not only to punish patently criminal conduct, but also to foster an orderly and dutiful fighting force. One need only read the history of the permissive—and short-lived—regime of the Soviet Army in the early days of the Russian Revolution to know that command indulgence of an undisciplined rank and file can decimate a fighting force. Moreover, the fearful specter of arbitrary enforcement of the articles, the engine of the dissent, is disabled, in my view, by the elaborate system of military justice that Congress has provided to servicemen, and by the self-evident, and self-selective, factor that commanders who are arbitrary with their charges will not produce the effi-

cient and effective military organization this country needs and demands for its defense.

In *Fletcher* v. *United States,* 26 Ct. Cl. 541 (1891), the Court of Claims reviewed a court-martial finding that a Captain Fletcher was guilty of conduct unbecoming an officer in having, " *'with intent to defraud, failed, neglected, and refused to pay [one W.] the amount due him, though repeatedly requested to do so.'* " The court found this charged offense to come within the article. The sentiments expressed by Judge Nott, writing for the court in that case, are just as applicable to the case we decide today.

> "It must be confessed that, in the affairs of civil life and under the rules and principles of municipal law, what we ordinarily know as fraud relates to the obtaining of a man's money, and not to refusing to pay it back. It is hard for the trained lawyer to conceive of an indictment or declaration which should allege that the defendant defrauded A or B by refusing to return to him the money which he had borrowed from him. Our legal training, the legal habit of mind, as it is termed, inclines us to dissociate punishment from acts which the law does not define as offenses. As one of our greatest writers of fiction puts it, with metaphysical fitness and accurate sarcasm, as she describes one of her legal characters, 'His moral horizon was limited by the civil code of Tennessee.' That it is a fraud to obtain a man's money by dishonest representations, but not a fraud to keep it afterwards by any amount of lying and deceit, is a distinction of statutory tracing. The gambler who throws away other people's money and the spendthrift who uses it in luxurious living instead of paying it back, cheat and defraud their creditors as effectually as the knaves and sharpers who

drift within the meshes of the criminal law. We learnt as law students in Blackstone that there are things which are *malum in se* and, in addition to them, things which are merely *malum prohibitum;* but unhappily in the affairs of real life we find that there are many things which are *malum in se* without likewise being *malum prohibitum.* In military life there is a higher code termed honor, which holds its society to stricter accountability; and it is not desirable that the standard of the Army shall come down to the requirements of a criminal code." *Id.,* at 562–563.

Relativistic notions of right and wrong, or situation ethics, as some call it, have achieved in recent times a disturbingly high level of prominence in this country, both in the guise of law reform, and as a justification of conduct that persons would normally eschew as immoral and even illegal. The truth is that the moral horizons of the American people are not footloose, or limited solely by "the civil code of Tennessee." The law should, in appropriate circumstances, be flexible enough to recognize the moral dimension of man and his instincts concerning that which is honorable, decent, and right.*

---

*My Brother DOUGLAS' rendition of Captain Levy's offense in this case would leave one to believe that Levy was punished for speaking against the Vietnam war at an Army wives' tea party. In fact, Levy was convicted under charges that he, while in the performance of his duties at the United States Army Hospital in Fort Jackson, South Carolina, told the enlisted personnel in his charge that he would not train Special Forces aide men "because they are 'liars and thieves,' 'killers of peasants,' and 'murderers of women and children.'" He also stated, in the presence of patients and those performing duty under his immediate supervision, that he would refuse to go to Vietnam if ordered to do so and they should refuse to do so. Moreover, after being ordered to give dermatological training to aide men, he announced to his students that "[t]he Hospital Commander has given me an order to train special forces personnel, which order I

MR. JUSTICE DOUGLAS, dissenting.

Congress by Art. I, § 8, cl. 14, has power "To make Rules for the Government and Regulation of the land and naval Forces."

Articles 133 [1] and 134 [2] of the Uniform Code of Military Justice, 10 U. S. C. §§ 933 and 934, at issue in this case, trace their legitimacy to that power.

So far as I can discover the only express exemption of a person in the Armed Services from the protection of the Bill of Rights is that contained in the Fifth Amendment which dispenses with the need for "a presentment or indictment" of a grand jury "in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger."

By practice and by construction the words "all criminal prosecutions" in the Sixth Amendment do not necessarily cover all military trials. One result is that the guarantee of the Sixth Amendment of trial "by an impartial jury" is not applicable to military trials.[3] But Judge Fergu-

---

have refused and will not obey." Unless one is to blind one's eyes in utter worship of the First Amendment, it needs no explication that these disloyal statements and actions undertaken by an officer in the course of duty, are subject to sanction.

[1] "Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

[2] "Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."

[3] *O'Callahan* v. *Parker*, 395 U. S. 258, 262, stated:

"If the case does not arise *'in the land or naval forces,'* then the accused gets *first,* the benefit of an indictment by a grand jury

son in *United States* v. *Tempia,* 16 U. S. C. M. A. 629, 37 C. M. R. 249, properly said:[4]

"[B]oth the Supreme Court and this Court itself are satisfied as to the applicability of constitutional safeguards to military trials, except insofar as they are made inapplicable either expressly or by necessary implication. The Government, therefore, is correct in conceding the point, and the Judge Advocate General, United States Navy, as *amicus curiae,* is incorrect in his contrary conclusion. Indeed, as to the latter, it would appear from the authorities on which he relies that the military courts applied what we now know as the constitutional protection against self-incrimination in trials prior to and contemporaneous with the adoption of the Constitution. Hence, we find Major Andre being extended the privilege at his court-martial in 1780. Wigmore,

---

and *second,* a trial by jury before a civilian court as guaranteed by the Sixth Amendment and by Art. III, § 2, of the Constitution which provides in part:

" 'The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.' "

[4] The Court of Military Appeals has held that the "probable cause" aspect of the Fourth Amendment is applicable to military trials. See, *e. g., United States* v. *Battista,* 14 U. S. C. M. A. 70, 33 C. M. R. 282; *United States* v. *Gebhart,* 10 U. S. C. M. A. 606, 28 C. M. R. 172; *United States* v. *Brown,* 10 U. S. C. M. A. 482, 28 C. M. R. 48.

It has been held that the right to counsel under the Sixth Amendment extends to military trials, see *United States* v. *Culp,* 14 U. S. C. M. A. 199, 216–217, 219, 33 C. M. R. 411, 428–429, 431 (opinions of Quinn, C. J., Ferguson, J.).

There are rulings also that freedom of speech protects, to some extent at least, those in the Armed Services. *United States* v. *Wysong,* 9 U. S. C. M. A. 249, 26 C. M. R. 29, and see *United States* v. *Gray,* 20 U. S. C. M. A. 63, 42 C. M. R. 255.

Evidence, 3d ed, § 2251. The same reference was made in the trial of Commodore James Barron in 1808. Proceedings of the General Court Martial Convened for the Trial of Commodore James Barron (1822), page 98. And, the Articles of War of 1776, as amended May 31, 1786, provided for objection by the judge advocate to any question put to the accused, the answer to which might tend to incriminate him. See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 196, 972." 16 U. S. C. M. A., at 634, 37 C. M. R., at 254.

But the cases we have had so far have concerned only the nature of the tribunal which may try a person and/or the procedure to be followed.[5] This is the first case that presents to us a question of what protection, if any, the First Amendment gives people in the Armed Services:

"Congress shall make no law . . . abridging the freedom of speech, or of the press."

On its face there are no exceptions—no preferred classes for whose benefit the First Amendment extends, no exempt classes.

The military by tradition and by necessity demands discipline; and those necessities require obedience in training and in action. A command is speech brigaded with action, and permissible commands may not be disobeyed. There may be a borderland or penumbra that in time can be established by litigated cases.

I cannot imagine, however, that Congress would think it had the power to authorize the military to curtail the

---

[5] See, e. g., *O'Callahan* v. *Parker*, 395 U. S. 258; *McElroy* v. *United States ex rel. Guagliardo*, 361 U. S. 281; *Grisham* v. *Hagan*, 361 U. S. 278; *Kinsella* v. *United States ex rel. Singleton*, 361 U. S. 234; *Reid* v. *Covert*, 354 U. S. 1; *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11; *Ex parte Quirin*, 317 U. S. 1.

reading list of books, plays, poems, periodicals, papers, and the like which a person in the Armed Services may read. Nor can I believe Congress would assume authority to empower the military to suppress conversations at a bar, ban discussions of public affairs, prevent enlisted men or women or draftees from meeting in discussion groups at times and places and for such periods of time that do not interfere with the performance of miltary duties.

Congress has taken no such step here. By Art. 133 it has allowed punishment for "conduct unbecoming an officer and a gentleman." In our society where diversities are supposed to flourish it never could be "unbecoming" to express one's views, even on the most controversial public issue.

Article 134 covers only "all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces."

Captain Levy, the appellee in the present case, was not convicted under Arts. 133 and 134 for failure to give the required medical instructions. But as he walked through the facilities and did his work, or met with students, he spoke of his views of the "war" in Vietnam. Thus he said:

> "The United States is wrong in being involved in the Viet Nam War. I would refuse to go to Viet Nam if ordered to do so. I don't see why any colored soldier would go to Viet Nam; they should refuse to go to Viet Nam and if sent should refuse to fight because they are discriminated against and denied their freedom in the United States, and they are sacrificed and discriminated against in Viet Nam by being given all the hazardous duty and they are suffering the majority of casualties. If I were

a colored soldier I would refuse to go to Viet Nam and if I were a colored soldier and were sent I would refuse to fight. Special Forces personnel are liars and thieves and killers of peasants and murderers of women and children."

Those ideas affronted some of his superiors. The military, of course, tends to produce homogenized individuals who think—as well as march—in unison. In *United States* v. *Blevens,* 5 U. S. C. M. A. 480, 18 C. M. R. 104, the Court of Military Appeals upheld the court-martial conviction of a serviceman who had "affiliated" himself with a Communist organization in Germany. The serviceman argued that there was no allegation that he possessed any intent to overthrow the Government by force, so that the Smith Act, 18 U. S. C. § 2385, would not reach his conduct. The Court of Military Appeals affirmed on the theory that his affiliation, nonetheless, brought "discredit" on the Armed Forces within the meaning of Art. 134:

"Most important to the case is the Government's contention that regardless of any deficiencies under the Smith Act, the specification properly alleges, and the evidence adequately establishes, conduct to the discredit of the armed forces, in violation of Article 134.

. . . . .

"Membership by a school teacher in an organization advocating the violent disestablishment of the United States Government has been regarded as conduct requiring dismissal. *Adler* v. *Board of Education,* 342 U. S. 485. It seems to us that such membership is even more profoundly evil in the case of a person in the military establishment. True, affiliation implies something less than membership (*Bridges* v. *Wixon,* 326 U. S. 135, 143), but the

supreme duty of the military is the protection and security of the government and of the people. Hence, aside from a specific intent on the part of the accused to overthrow the government by violence, the conduct alleged is definitely discrediting to the armed forces." 5 U. S. C. M. A., at 483–484, 18 C. M. R., at 107–108.

The limitations on expressions of opinion by members of the military continue to date. During the Vietnam war, a second lieutenant in the reserves, off duty, out of uniform, and off base near a local university, carried a placard in an antiwar demonstration which said "END JOHNSON'S FACIST [sic] AGGRESSION IN VIET NAM." He was convicted by a court-martial under Art. 88 for using "contemptuous words" against the President and under Art. 133 for "conduct unbecoming an officer." The Court of Military Appeals affirmed, theorizing that suppression of such speech was essential to prevent a military "man on a white horse" from challenging "civilian control of the military." *United States* v. *Howe,* 17 U. S. C. M. A. 165, 175, 37 C. M. R. 429, 439. The Court did not attempt to weigh the likelihood that Howe, a reserve second lieutenant engaging in a single off-base expression of opinion on the most burning political issue of the day, could ever be such a "man on a white horse." Indeed, such considerations were irrelevant:

"True, petitioner is a reserve officer, rather than a professional officer, but during the time he serves on active duty he is, and must be, controlled by the provisions of military law. In this instance, military restrictions fall upon a reluctant 'summer soldier'; but at another time, and differing circumstances, the ancient and wise provisions insuring civilian control of the military will restrict the 'man on a white horse.' " *Ibid.*

See generally Sherman, The Military Courts And Servicemen's First Amendment Rights, 22 Hastings L. J. 325 (1971.)

The power to draft an army includes, of course, the power to curtail considerably the "liberty" of the people who make it up. But Congress in these articles has not undertaken to cross the forbidden First Amendment line. Making a speech or comment on one of the most important and controversial public issues of the past two decades cannot by any stretch of dictionary meaning be included in "disorders and neglects to the prejudice of good order and discipline in the armed forces." Nor can what Captain Levy said possibly be "conduct of a nature to bring discredit upon the armed forces." He was uttering his own belief—an article of faith that he sincerely held. This was no mere ploy to perform a "subversive" act. Many others who loved their country shared his views. They were not saboteurs. Uttering one's beliefs is sacrosanct under the First Amendment.[6] Punishing the utterances is an "abridgment" of speech in the constitutional sense.

---

[6] The words of Mr. Justice Holmes written in dissent in *United States* v. *Schwimmer*, 279 U. S. 644, 654–655, need to be recalled: "[T]he whole examination of the applicant shows that she holds none of the now-dreaded creeds but thoroughly believes in organized government and prefers that of the United States to any other in the world. Surely it cannot show lack of attachment to the principles of the Constitution that she thinks that it can be improved. I suppose that most intelligent people think that it might be. Her particular improvement looking to the abolition of war seems to me not materially different in its bearing on this case from a wish to establish cabinet government as in England, or a single house, or one term of seven years for the President. To touch a more burning question, only a judge mad with partisanship would exclude because the applicant thought that the Eighteenth Amendment should be repealed.

"Of course the fear is that if a war came the applicant would exert activities such as were dealt with in *Schenck* v. *United States*,

Mr. Justice Stewart, with whom Mr. Justice Douglas and Mr. Justice Brennan join, dissenting.

Article 133 of the Uniform Code of Military Justice, 10 U. S. C. § 933, makes it a criminal offense to engage in "conduct unbecoming an officer and a gentleman."[1] Article 134, 10 U. S. C. § 934, makes crim-

249 U. S. 47. But that seems to me unfounded. Her position and motives are wholly different from those of Schenck. She is an optimist and states in strong and, I do not doubt, sincere words her belief that war will disappear and that the impending destiny of mankind is to unite in peaceful leagues. I do not share that optimism nor do I think that a philosophic view of the world would regard war as absurd. But most people who have known it regard it with horror, as a last resort, and even if not yet ready for cosmopolitan efforts, would welcome any practicable combinations that would increase the power on the side of peace. The notion that the applicant's optimistic anticipations would make her a worse citizen is sufficiently answered by her examination, which seems to me a better argument for her admission than any that I can offer. Some of her answers might excite popular prejudice, but if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate. I think that we should adhere to that principle with regard to admission into, as well as to life within this country. And recurring to the opinion that bars this applicant's way, I would suggest that the Quakers have done their share to make the country what it is, that many citizens agree with the applicant's belief and that I had not supposed hitherto that we regretted our inability to expel them because they believe more than some of us do in the teachings of the Sermon on the Mount."

That dissent by Holmes became the law when *Schwimmer, supra, United States* v. *Macintosh*, 283 U. S. 605, and *United States* v. *Bland*, 283 U. S. 636, were overruled by *Girouard* v. *United States*, 328 U. S. 61.

[1] Article 133 provides:

"Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

inal "all disorders and neglects to the prejudice of good order and discipline in the armed forces." and "all conduct of a nature to bring discredit upon the armed forces." [2] The Court today, reversing a unanimous judgment of the Court of Appeals, upholds the constitutionality of these statutes. I find it hard to imagine criminal statutes more patently unconstitutional than these vague and uncertain general articles, and I would, accordingly, affirm the judgment before us.

I

As many decisions of this Court make clear, vague statutes suffer from at least two fatal constitutional defects. First, by failing to provide fair notice of precisely what acts are forbidden, a vague statute "violates the first essential of due process of law." *Connally* v. *Gen-*

---

[2] Article 134 provides:

"Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."

The clause in Art. 134 prohibiting all "crimes and offenses not capital" applies only to crimes and offenses proscribed by Congress. See Manual for Courts-Martial ¶ 213 (e) (1969) (hereinafter sometimes referred to as Manual). Cf. *Grafton* v. *United States,* 206 U. S. 333. As such, this clause is simply assimilative, like 18 U. S. C. § 13, and is not the subject of the vagueness attack mounted by appellee on the balance of Art. 134. See generally Wiener, Are the General Military Articles Unconsitutionally Vague?, 54 A. B. A. J. 357, 358; Note, Taps for the Real Catch-22, 81 Yale L. J. 1518 n. 3.

While only Art. 134 is expressly termed the "general article," Arts. 133 and 134 are commonly known as the "general articles" and will be so referred to herein.

*eral Construction Co.*, 269 U. S. 385, 391. As the Court put the matter in *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." "Words which are vague and fluid . . . may be as much of a trap for the innocent as the ancient laws of Caligula." *United States* v. *Cardiff*, 344 U. S. 174, 176.[3]

Secondly, vague statutes offend due process by failing to provide explicit standards for those who enforce them, thus allowing discriminatory and arbitrary enforcement. *Papachristou* v. *City of Jacksonville*, 405 U. S. 156, 165–171. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis . . . ." *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109.[4] The absence of specificity in a criminal statute invites abuse on the part of prosecuting officials, who are left free to harass any individuals or groups who may be the object of official displeasure.[5]

---

[3] See also *United States* v. *Harriss*, 347 U. S. 612, 617:

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

[4] See also *Smith* v. *Goguen*, 415 U. S. 566, 575:

"Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law."

[5] This Court has repeatedly recognized that the dangers inherent in vague statutes are magnified where laws touch upon First Amendment freedoms. See, *e. g.*, *id.*, at 573; *Grayned* v. *City of Rockford*, 408 U. S. 104, 109. In such areas, more precise statutory

It is plain that Arts. 133 and 134 are vague on their face; indeed, the opinion of the Court does not seriously contend to the contrary.[6] Men of common intelligence—including judges of both military and civilian courts—must necessarily speculate as to what such terms as "conduct unbecoming an officer and a gentleman" and "conduct of a nature to bring discredit upon the armed forces" really mean. In the past, this Court has held unconstitutional statutes penalizing "misconduct," [7] conduct that was "annoying," [8] "reprehensible," [9] or "prejudicial to the best interests" of a city,[10] and it is significant that military courts have resorted to several of these very terms in describing the sort of acts proscribed by Arts. 133 and 134.[11]

---

specificity is required, lest cautious citizens steer clear of protected conduct in order to be certain of not violating the law. See generally Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 75–85.

[6] Even one of the staunchest defenders of the general articles has recognized that:

"It cannot be denied that there is language in the void-for-vagueness cases broad enough to condemn as unduly indefinite the prohibition in Article 133 against 'conduct unbecoming an officer and a gentleman' and the prohibitions in Article 134 against 'all disorders and neglects to the prejudice of good order and discipline in the armed forces' and against 'all conduct of a nature to bring discredit upon the armed forces.'" Wiener, *supra,* n. 2, at 363.

[7] *Giaccio* v. *Pennsylvania,* 382 U. S. 399.

[8] *Coates* v. *Cincinnati,* 402 U. S. 611.

[9] *Giaccio* v. *Pennsylvania, supra.*

[10] *Gelling* v. *Texas,* 343 U. S. 960. Other federal courts have similarly held unconstitutional statutes containing language such as "reflect[s] discredit," *Flynn* v. *Giarrusso,* 321 F. Supp. 1295 (ED La.); "offensive," *Pritikin* v. *Thurman,* 311 F. Supp. 1400 (SD Fla.); and "immoral" or "demoralizing," *Oestreich* v. *Hale,* 321 F. Supp. 445 (ED Wis.).

[11] See, *e. g., United States* v. *Lee,* 4 C. M. R. 185, 191 (ABR), petition for review denied, 1 U. S. C. M. A. 713, 4 C. M. R. 173 ("repre-

Facially vague statutes may, of course, be saved from unconstitutionality by narrowing judicial construction. But I cannot conclude, as does the Court, *ante,* at 752–755, that the facial vagueness of the general articles has been cured by the relevant opinions of either the Court of Military Appeals or any other military tribunal. In attempting to give meaning to the amorphous words of the statutes, the Court of Military Appeals has repeatedly turned to Winthrop's Military Law and Precedents, an 1886 treatise. That work describes "conduct unbecoming an officer and a gentleman" in the following manner:

> "To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents." [12]

hensible conduct"); *United States* v. *Rio Poon,* 26 C. M. R. 830, 833 (CGBR) ("universally reprehended"). See also Note, Taps for the Real Catch–22, 81 Yale L. J. 1518, 1522.

[12] W. Winthrop, Military Law and Precedents 711–712 (2d ed. 1920). The cited language is quoted in *United States* v. *Howe,* 17 U. S. C. M. A. 165, 177–178, 37 C. M. R. 429, 441–442, and in *United States* v. *Giordano,* 15 U. S. C. M. A. 163, 168, 35 C. M. R. 135, 140.

Such authoritative publications as The Officer's Guide do little better in defining "conduct unbecoming an officer and a gentleman":

"There are certain moral attributes which belong to the ideal officer and the gentleman, a lack of which is indicated by acts of dishonesty or unfair dealing, of indecency or indecorum, or of lawlessness, injustice, or cruelty. Not every one can be expected to meet ideal standards or to possess the attributes in the exact degree de-

As to the predecessor statute of Art. 134, Col. Winthrop read it as applicable to conduct whose prejudice to good order and discipline was *"reasonably direct and palpable,"* as opposed to that conduct which is simply *"indirectly or remotely"* prejudicial—whatever that may mean.[13] These passages, and the decisions of the Court of Military Appeals that adopt them verbatim, scarcely add any substantive content to the language of the general articles. At best, the limiting constructions referred to by the Court represent a valiant but unavailing effort to read some specificity into hopelessly vague laws. Winthrop's definitions may be slightly different in wording from Arts. 133 and 134, but they are not different in kind, for they suffer from the same vagueness as the statutes to which they refer.

If there be any doubt as to the absence of truly limiting constructions of the general articles, it is swiftly dispelled by even the most cursory review of convictions under them in the military courts. Article 133 has been recently employed to punish such widely disparate conduct as dishonorable failure to repay debts,[14] selling whiskey at an

---

manded by the standards of his own time; but there is a limit of tolerance below which the individual standards in these respects of an officer or cadet cannot fall without his being morally unfit to be an officer or cadet or to be considered a gentleman. This article contemplates such conduct by an officer or cadet which, taking all the circumstances into consideration, satisfactorily shows such moral unfitness." R. Reynolds, The Officer's Guide 435–436 (1969 rev.). This language is substantially repeated in Manual ¶ 212.

[13] W. Winthrop, Military Law and Precedents 723 (2d ed. 1920). For cases embodying these definitions, see *United States* v. *Sadinsky,* 14 U. S. C. M. A. 563, 34 C. M. R. 343; *United States* v. *Holiday,* 4 U. S. C. M. A. 454, 16 C. M. R. 28. See also Manual ¶ 213 (b), containing identical language.

[14] *United States* v. *Journell,* 18 C. M. R. 752 (AFBR).

unconscionable price to an enlisted man,[15] cheating at cards,[16] and having an extramarital affair.[17] Article 134 has been given an even wider sweep, having been applied to sexual acts with a chicken,[18] window peeping in a trailer park,[19] and cheating while calling bingo numbers.[20] Convictions such as these leave little doubt that "[a]n infinite variety of other conduct, limited only by the scope of a commander's creativity or spleen, can be made the subject of court-martial under these articles." Sherman, The Civilianization of Military Law, 22 Maine L. Rev. 3, 80.

In short, the general articles are in practice as well as theory "catch-alls," designed to allow prosecutions for practically any conduct that may offend the sensibilities of a military commander.[21] Not every prosecution of

[15] *United States* v. *Kupfer*, 9 C. M. R. 283 (ABR), aff'd, 3 U. S. C. M. A. 478, 13 C. M. R. 34.

[16] *United States* v. *West*, 16 C. M. R. 587 (AFBR), petition for review denied, 4 U. S. C. M. A. 744, 20 C. M. R. 398.

[17] *United States* v. *Alcantara*, 39 C. M. R. 682 (ABR), aff'd, 18 U. S. C. M. A. 372, 40 C. M. R. 84.

For a listing of other representative convictions under Art. 133, see H. Moyer, Justice and the Military 1028–1034 (1972). See also Nelson, Conduct Expected of an Officer and a Gentleman: Ambiguity, 12 AF JAG L. Rev. 124.

[18] *United States* v. *Sanchez*, 11 U. S. C. M. A. 216, 29 C. M. R. 32.

[19] *United States* v. *Clark*, 22 C. M. R. 888 (AFBR), petition for review denied, 7 U. S. C. M. A. 790, 22 C. M. R. 331.

[20] *United States* v. *Holt*, 7 U. S. C. M. A. 617, 23 C. M. R. 81.

[21] The drafters of the Manual for Courts-Martial have admitted as much, characterizing the discredit clause of Art. 134 as the "catch-all" in military law. Legal and Legislative Basis, Manual for Courts-Martial United States 294 (1951). Admitting that the language of Art. 134 is "vague," the drafters state:

"By judicial interpretation these 'vague words' have since been expanded from the narrow construction placed on them by their author to the point where they have been used as the legal justification to sustain convictions for practically any offense committed by

course, results in a conviction, and the military courts have sometimes overturned convictions when the conduct involved was so marginally related to military discipline as to offend even the loosest interpretations of the general articles.[22] But these circumstances can hardly be thought to validate the otherwise vague statutes. As the Court said in *United States* v. *Reese,* 92 U. S. 214, 221: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." At best, the general articles are just such a net, and suffer from all the vices that our previous decisions condemn.

## II

Perhaps in recognition of the essential vagueness of the general articles, the Court today adopts several rather periphrastic approaches to the problem before us. Whatever the apparent vagueness of these statutes to us civilians, we are told, they are models of clarity to " 'practical men in the navy and army.' " *Ante,* at 747, quoting from *Dynes* v. *Hoover,* 20 How. 65, 82. Moreover, the Court says, the appellee should have been well aware that his conduct fell within the proscriptions of the general articles, since the Manual for Courts-Martial gives specific content to these facially uncertain statutes. I be-

---

one in the military service which is not either specifically denounced by some other article, or is not a crime or offense not capital or a disorder or neglect to the prejudice of good order and discipline." *Id ,* at 295.

[22] See, *e. g., United States* v. *Ford,* 31 C. M. R. 353 (ABR), petition for review denied, 12 U. S. C. M. A. 763, 31 C. M. R. 314 (conviction under Art. 133 for showing an allegedly obscene photograph to a friend in a private home reversed); *United States* v. *Waluski,* 6 U. S. C. M. A. 724, 21 C. M. R. 46 (conviction under Art. 134 of passenger for leaving scene of accident reversed).

lieve that neither of these propositions can withstand analysis.

## A

It is true, of course, that a line of prior decisions of this Court, beginning with *Dynes* v. *Hoover, supra,* in 1858 and concluding with *Carter* v. *McClaughry,* 183 U. S. 365, in 1902, have upheld against constitutional attack the ancestors of today's general articles.[23]  With all respect for the principle of *stare decisis,* however, I believe that these decisions should be given no authoritative force in view of what is manifestly a vastly "altered historic environment."  *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600, 634–635 (dissenting opinion).  See also *id.,* at 627–628 (POWELL, J., concurring).

It might well have been true in 1858 or even 1902 that those in the Armed Services knew, through a combination of military custom and instinct, what sorts of acts fell within the purview of the general articles.  But times have surely changed.  Throughout much of this country's early history, the standing army and navy numbered in the hundreds.  The cadre was small, professional, and voluntary.  The military was a unique society, isolated from the mainstream of civilian life, and it is at least plausible to suppose that the volunteer in that era understood what conduct was prohibited by the general articles.[24]

It is obvious that the Army into which Dr. Levy entered was far different.  It was part of a military

---

[23] See also *Swaim* v. *United States,* 165 U. S. 553; *United States* v. *Fletcher,* 148 U. S. 84; *Smith* v. *Whitney,* 116 U. S. 167.

[24] See generally Comment, The Discredit Clause of the UCMJ: An Unrestricted Anachronism, 18 U. C. L. A. L. Rev. 821, 833–837.  Cf. Warren, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 187–188; Wiener, Courts-Martial and the Bill of Rights: The Original Practice II, 72 Harv. L. Rev. 266, 292, 301–302.

establishment whose members numbered in the millions,
a large percentage of whom were conscripts or draft-
induced volunteers, with no prior military experience and
little expectation of remaining beyond their initial period
of obligation.[25]   Levy was precisely such an individual,
a draft-induced volunteer whose military indoctrination
was minimal, at best.[26]   To presume that he and others
like him who served during the Vietnam era were so
imbued with the ancient traditions of the military as to
comprehend the arcane meaning of the general articles
is to engage in an act of judicial fantasy.[27]   In my view,

----

[25] See Comment, 18 U. C. L. A. L. Rev., *supra,* at 836. Cf.
*Avrech* v. *Secretary of the Navy,* 155 U. S. App. D. C. 352, 357, 477
F. 2d 1237, 1242 (Clark, J.), prob. juris. noted, 414 U. S. 816.

[26] The record indicates that Dr. Levy, unlike many other medical
officers entering active duty, did not attend the basic military orienta-
tion course at Fort Sam Houston, Texas.   Instead, he came to Fort
Jackson directly from civilian life.   While at Fort Jackson, he re-
ceived but 16 to 26 hours of military training, only a small portion of
which was devoted to military justice.

[27] The Court suggests, *ante,* at 751–752, that some of the problems
with the general articles may be ameliorated by the requirement of
Art. 137, 10 U. S. C. § 937, that the provisions of the Code
be "carefully explained to each enlisted member at the time of
his entrance on active duty, or within six days thereafter," and
that they be "explained again after he has completed six months of
active duty."   Even assuming, *arguendo,* that it is possible to "care-
fully explain" the general articles, I do not believe that Art. 137
cures the vagueness of the statutes.   The record in this case indi-
cates that Dr. Levy received only a very brief amount of instruc-
tion on military justice; presumably, only a fraction of that
instruction was devoted to the general articles.   See n. 26, *supra.*
Moreover, Army regulations indicate that only 20 minutes of instruc-
tion at the initial military justice lesson for enlisted men is devoted to
Arts. 71 through 134 of the UCMJ; 49 minutes of instruc-
tion on Arts. 107 through 134 is provided for at the six-month
class.   Department of the Army, Army Regulation 350–212, Train-
ing, Military Justice, 2 June 1972; Army Subject Schedule No. 21–

we do a grave disservice to citizen soldiers in subjecting them to the uncertain regime of Arts. 133 and 134 simply because these provisions did not offend the sensibilities of the federal judiciary in a wholly different period of our history. In today's vastly "altered historic environment," the *Dynes* case and its progeny have become constitutional anachronisms, and I would retire them from active service.

## B

The Court suggests that the Manual for Courts-Martial provides some notice of what is proscribed by the general articles, through its Appendix containing "Forms for Charges and Specifications." [28] These specimen charges, which consist of "fill-in-the-blank" accusations covering various fact situations, do offer some indication of what conduct the drafters of the Manual perceived to fall within the prohibitions of Arts. 133 and 134. There are several reasons, however, why the form specifications cannot provide the sort of definitive interpretation of the general articles necessary to save these statutes from unconstitutionality.

For one thing, the specifications covering Arts. 133 and 134 are not exclusive; the military courts have repeatedly held conduct not listed in the Manual's Appendix as nonetheless violative of the general articles.[29] Nor can it

---

10, Military Justice (Enlisted Personnel Training), 24 June 1969. Obviously, only a portion of this total of 69 minutes can be set aside for instruction pertaining to the general articles. It would be myopic to pretend that such limited instruction on these amorphous criminal statutes provided military personnel with any genuine expertise on the subject, even assuming that *anybody* could *ever* acquire such expertise.

[28] Manual, App. 6c.

[29] See, *e. g., United States* v. *Sadinsky,* 14 U. S. C. M. A. 563, 34 C. M. R. 343 (jumping from ship to sea); *United States* v. *Sanchez,* 11 U. S. C. M. A. 216, 29 C. M. R. 32 (sexual acts with a

be said that the specifications contain any common thread or unifying theme that gives generic definition to the articles' vague words; the specimen charges in the Manual list such widely disparate conduct as kicking a public horse in the belly,[30] subornation of perjury,[31] and wrongful cohabitation [32] as violative of Art. 134.[33] Moreover, the list of offenses included in the Appendix is ever-expanding; the 1951 Manual contained 59 Art. 134 offenses,[34] while the list had increased to 63 in 1969.[35] In view of the nonexclusive and transient character of the specification list, a serviceman wishing to conform his conduct to the requirements of the law would simply find definitive guidance from the Manual impossible.

More significantly, the fact that certain conduct is listed in the Manual is no guarantee that it is in violation of the general articles. The Court of Military Appeals has repeatedly emphasized that the sample specifications are only procedural guides and timesavers for military prosecutors beset by poor research facilities, and are not intended to *create* offenses under the general

---

chicken). See also *Avrech* v. *Secretary of the Navy,* 155 U. S. App. D. C., at 357, 477 F. 2d, at 1242; Manual, App. 6*a*.1: Legal and Legislative Basis, Manual for Courts-Martial United States 296 (1951).

[30] Manual, App. 6*c,* Spec. 126.

[31] *Id.,* App. 6*c,* Spec. 170.

[32] *Id.,* App. 6*c,* Spec. 188.

[33] Similarly, the specifications concerning Art. 133 cover such dissimilar offenses as copying an examination paper, being drunk and disorderly, failing to pay a debt, and failure to keep a promise to pay a debt. *Id.,* App. 6*c,* Specs. 122–125. Nowhere under the Art. 133 specifications is there any mention of the conduct with which Levy was charged.

[34] *Id.,* App. 6*c,* Specs. 118–176 (1951 ed.).

[35] *Id.,* App. 6*c,* Specs. 126–188 (1969).

articles.[36] Consequently, the court has on several occasions disapproved Art. 134 convictions, despite the fact that the precise conduct at issue was listed in the form specifications as falling under that article.[37]

Despite all this, the Court indicates that Levy should have been aware that *his* conduct was violative of Art. 134, since one of the specimen charges relates to the making of statements "disloyal to the United States." [38] That specification, and the brief reference to such conduct in the text of the Manual,[39] is itself so vague and overbroad as to have been declared unconstitutional by one federal court. *Stolte* v. *Laird,* 353 F. Supp. 1392 (DC). But even if a consensus as to the meaning of the word "disloyal" were readily attainable, I am less than confident that Dr. Levy's attacks upon our Vietnam policies could be accurately characterized by such an adjective. How-

---

[36] See *United States* v. *Smith,* 13 U. S. C. M. A. 105, 32 C. M. R. 105; *United States* v. *McCormick,* 12 U. S. C. M. A. 26, 30 C. M. R. 26. In these and other cases, the Court of Military Appeals has indicated its belief that Congress did not and could not empower the President to promulgate substantive rules of law for the military. See also *United States* v. *Barnes,* 14 U. S. C. M. A. 567, 34 C. M. R. 347; *United States* v. *Margelony,* 14 U. S. C. M. A. 55, 33 C. M. R. 267. Cf. *United States* v. *Acosta-Vargas,* 13 U. S. C. M. A. 388, 32 C. M. R. 388. The question as to whether the Executive has such an inherent power was apparently left open by this Court in *Reid* v. *Covert,* 354 U. S. 1, 38, and it is not necessary to resolve it in this case. It is enough to note that the Court of Military Appeals has clearly held that inclusion of specific conduct in the Manual does not necessarily mean that it is violative of the general articles. Given that position of the highest military court, I can hardly conclude that a serviceman could ever receive authoritative notice from the form specifications as to the scope of the articles.

[37] See, *e. g., United States* v. *McCormick,* 12 U. S. C. M. A. 26, 30 C. M. R. 26; *United States* v. *Waluski,* 6 U. S. C. M. A. 724, 21 C. M. R. 46.

[38] Manual, App. 6c, Spec. 139.

[39] *Id.,* ¶ 213f (5).

ever foreign to the military atmosphere of Fort Jackson, the words spoken by him represented a viewpoint shared by many American citizens.  Whatever the accuracy of these views, I would be loath to impute "disloyalty" to those who honestly held them.   In short, I think it is clear that the form specification concerning disloyal statements cannot be said to have given Levy notice of the illegality of his conduct.  The specimen charge is no better than the article that spawned it.  It merely substitutes one set of subjective and amorphous phraseology for another.[40]

### III

What has been said above indicates my view that the general articles are unconstitutionally vague under the

---

[40] The Court also holds that even if the general articles might be considered vague as to some offenders, the appellee has no standing to raise such a claim, since he should have known that his conduct was forbidden.  *Ante,* at 755–757.   To the extent that this conclusion rests on the Court's holdings that the general articles are given content through limiting judicial constructions, military custom, or the Manual for Courts-Martial, I have indicated above my disagreement with its underlying premises.  And to the extent that this conclusion rests on the language of the general articles, I think that it is simply mistaken.   The words of Arts. 133 and 134 are vague beyond repair; I am no more able to discern objective standards of conduct from phrases such as "conduct unbecoming an officer and a gentleman" and "conduct of a nature to bring discredit upon the armed forces" than I am from such words as "bad" or "reprehensible."   Given this essential uncertainty, I cannot conclude that the statutory language clearly warned the appellee that his speech was illegal.  It may have been, of course, that Dr. Levy had a subjective feeling that his conduct violated *some* military law.   But that is not enough, for as we pointed out in *Bouie* v. *City of Columbia,* 378 U. S. 347, 355–356, n. 5, "[t]he determination whether a criminal statute provides fair warning of its prohibitions must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an *ad hoc* appraisal of the subjective expectations of particular defendants."

standards normally and repeatedly applied by this Court.
The remaining question is whether, as the Court con-
cludes, *ante,* at 756, the peculiar situation of the military
requires application of a standard of judicial review more
relaxed than that embodied in our prior decisions.

It is of course common ground that the military is a
"specialized community governed by a separate discipline
from that of the civilian." *Orloff* v. *Willoughby,* 345 U. S.
83, 94. A number of serviceman's individual rights must
necessarily be subordinated to the overriding military
mission, and I have no doubt that the military may con-
stitutionally prohibit conduct that is quite permissible in
civilian life, such as questioning the command of a su-
perior. But this only begins the inquiry. The question
before us is not whether the military may adopt substan-
tive rules different from those that govern civilian society,
but whether the serviceman has the same right as his
civilian counterpart to be informed as to precisely what
conduct those rules proscribe before he can be criminally
punished for violating them. More specifically, the issue
is whether the vagueness of the general articles is re-
quired to serve a genuine military objective.

The Solicitor General suggests that a certain amount of
vagueness in the general articles is necessary in order to
maintain high standards of conduct in the military, since
it is impossible to predict in advance every offense that
might serve to affect morale or discredit the service. It
seems to me that this argument was concisely and elo-
quently rebutted by Judge Aldisert in the Court of Ap-
peals, 478 F. 2d 772, 795 (CA3):

> "[W]hat high standard of conduct is served by
> convicting an individual of conduct he did not rea-
> sonably perceive to be criminal? Is not the essence
> of high standards in the military, first, knowing one's
> duty, and secondly, executing it? And, in this re-

gard, would not an even higher standard be served by delineation of the various offenses under Article 134, followed by obedience to these standards?"

It may be that military necessity justifies the promulgation of substantive rules of law that are wholly foreign to civilian life, but I fail to perceive how any legitimate military goal is served by enshrouding these rules in language so vague and uncertain as to be incomprehensible to the servicemen who are to be governed by them.[41]  Indeed, I should suppose that vague laws, with their serious capacity for arbitrary and discriminatory enforcement, can in the end only hamper the military's objectives of high morale and esprit de corps.

In short, I think no case has been made for finding that there is any legitimate military necessity for perpetuation of the vague and amorphous general articles.  In this regard, I am not alone.  No less an authority than Kenneth J. Hodson, former Judge Advocate General of the Army and Chief Judge of the Army Court of Military Review, has recommended the abolition of Art. 134 because "[w]e don't really need it, and we can't defend our use of it in this modern world."  Hodson, The Manual for Courts-Martial—1984, 57 Military L. Rev. 1, 12.[42]

---

[41] Cf. J. Heller, Catch–22, p. 395 (Dell ed. 1970):

" '[W]e accuse you also of the commission of crimes and infractions we don't even know about yet.  Guilty or innocent?'

" 'I don't know, sir.  How can I say if you don't tell me what they are?'

" 'How can we tell you if we don't know?' "

[42] General Hodson suggests that in place of Art. 134, the Department of Defense and various military commanders could promulgate specific sets of orders, outlawing particular conduct.  Those disobeying these orders could be prosecuted under Art. 92 of the UCMJ, 10 U. S. C. § 892, which outlaws the failure to obey any lawful order.  See also Note, Taps for the Real Catch–22, 81 Yale L. J. 1518, 1537–1541, containing a similar suggestion.

No different conclusion can be reached as to Art. 133. Both are anachronisms, whose legitimate military usefulness, if any, has long since disappeared.

It is perhaps appropriate to add a final word. I do not for one moment denigrate the importance of our inherited tradition that the commissioned officers of our military forces are expected to be men of honor, nor do I doubt the necessity that servicemen generally must be orderly and dutiful. An efficient and effective military organization depends in large part upon the character and quality of its personnel, particularly its leadership. The internal loyalty and mutual reliance indispensable to the ultimate effectiveness of any military organization can exist only among people who can be counted on to do their duty. It is, therefore, not only legitimate but essential that in matters of promotion, retention, duty assignment, and internal discipline, evaluations must repeatedly be made of a serviceman's basic character as reflected in his deportment, whether he be an enlisted man or a commissioned officer. But we deal here with criminal statutes. And I cannot believe that such meaningless statutes as these can be used to send men to prison under a Constitution that guarantees due process of law.